ATTORNEYS FOR APPELLANT

Ruth Johnson
Valerie K. Boots
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana



FILED

Feb 17 2015, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lori Ann Barcroft,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | February 17, 2015<br><br>Court of Appeals Case No.<br>49A05-1405-CR-215<br><br>Appeal from the<br>Marion Superior Court<br><br>The Honorable Kurt M. Eisgruber,<br>Judge<br><br>Cause No. 49G01-1205-MR-33537 |

**Kirsch, Judge.**

[1]     Lori Ann Barcroft was found guilty but mentally ill of murder[1] after a bench trial.  She appeals and raises two issues, of which we find the following dispositive:  whether the trial court committed fundamental error when it used Barcroft's request for an attorney, which she asserted before she made a

---

[1] *See* Ind. Code § 35-42-1-1(1).

statement to police, in its determination of whether Barcroft established that she was insane at the time she committed the crime of murder.

[2] We reverse and remand.

## Facts and Procedural History

[3] In approximately 2008 and thereafter, Jaman Iseminger ("Pastor Jaman") was a pastor at Bethel Memorial Church, which later changed its name to Bethel Community Church. The church was located on Southport Road in Marion County, Indiana. One of Barcroft's adult sons, Jordan Asbury ("Jordan"), was a member of the church. Barcroft and Barcroft's father also became members of the church, and Barcroft's mother and other adult sons attended the church periodically. Barcroft met Pastor Jaman in 2008.

[4] By around 2010, Jordan became concerned about Barcroft's deteriorating mental state, which he believed was caused by demonic possession. Jordan asked Pastor Jaman to help Barcroft, and Pastor Jaman told Jordan that Barcroft needed to be prayed over and hospitalized. After the death of her father, Barcroft deteriorated further, and Jordan attempted to hospitalize her, but she refused. On one occasion, Barcroft physically attacked a member of the church who was larger than she. Jordan and his wife, Tamia, told Barcroft that she could no longer live with them, as Tamia was fearful for her life. Barcroft then moved in with her mother, Roberta Pettigrew ("Pettigrew"). In May 2012, an incident occurred where Barcroft and Pettigrew were in the car with Barcroft's grandsons. Barcroft began yelling about Pastor Jaman and saying,

"you're all in it." *Def.'s Ex.* B at 114. When Pettigrew pulled over, Barcroft screamed to get out of the parking lot because it was near Ivy Tech, which Barcroft said was "Mexican Mafia." *Id.* Barcroft also screamed at Pettigrew and told her that she was "yellow" and against her. *Id.* Pettigrew learned that Barcroft had acquired a gun in May 2012. An officer with the Hendricks County Sheriff's Department told the family that Barcroft's gun was legal.

[5] On the morning of May 19, 2012, Pastor Jaman arrived at the church at about 6:45 a.m. in order to open the church kitchen for volunteers who were working on a restoration project in the cemetery located adjacent to the church and its parking lot. One of the volunteers, Jeff Harris, was in the kitchen when he noticed a woman, later identified as Barcroft, walking around the outside of the church. Barcroft wore a black hooded sweatshirt with its hood up and dark jeans and was carrying a backpack. Harris went outside, where Barcroft was standing in the exterior stairwell that led to the church's basement and Pastor Jaman's office and looking in through a basement window. Harris asked Barcroft if he could help her, and Barcroft asked if Pastor Jaman was there.

[6] Harris entered the church and went down the interior stairs to the basement, where he found Pastor Jaman in his office and told him a woman was there to see him. Although Harris was not aware of it, Barcroft had entered the church behind him and was waiting near the top of the interior stairs. Pastor Jaman followed Harris back up the stairs, and after Harris passed Barcroft, she fired a shot at Pastor Jaman. Barcroft turned, pointed the gun at Harris, and said "go, go." *Tr.* at 91. As Harris ran outside and called 911, he heard two more

gunshots. Barcroft then ran out of the church and crossed Southport Road. Pastor Jaman came up the exterior stairs, yelled for help, and collapsed on the ground. Lisa Walden, another volunteer, had been sleeping in her car in the church parking lot and heard the gunshots. Walden rushed to help Pastor Jaman while Harris talked to the 911 operator.

[7] Officers from the Southport and Indianapolis Metropolitan Police Departments, along with paramedics, responded to the church at approximately 7:00 a.m. After obtaining a description of the shooter and learning the direction of her flight, Officers John Czankusch and Daniel Ryan used a police dog in their search. The dog alerted to an area covered with waist-high weeds beneath a couple of trees that was located about a block from the church. Barcroft was found hiding under a blanket of vegetation in such a manner that the officers could only see some red fabric from her clothing or backpack. Officer Czankusch later testified that Barcroft was so well-hidden that the officers probably would not have found her without the police dog or unless they had actually stepped on her. *Id*. at 129. Officer Ryan ordered Barcroft twice to come out. Barcroft did not respond to the first command. When making the second command, Officer Ryan told Barcroft that he would shoot her if she did not come out or if she did not show her hands. *Id*. at 134. Barcroft then crawled out of the vegetation and was placed in handcuffs by Officer Czankusch. Officer Ryan asked Barcroft if she had a gun, and Barcroft said yes and informed him that the gun was in her jacket pocket. At the time of her apprehension, the officers noted Barcroft's calm demeanor.

[8] The gun that Barcroft had in her possession was determined to be a semiautomatic .22 caliber pistol. Officers searched Barcroft's backpack and found an ammunition container with ninety-two live .22 caliber rounds. Inside the backpack, they also found binoculars, personal items, and letters Barcroft had written to her mother and her sons with a theme of saying goodbye. A crime scene investigation discovered three fired casings inside the church -- one on the landing of the main floor near the interior stairs, one on the interior stairs, and one on the hallway of the main floor near the chapel entrance. There were also three live rounds on the floor inside the church, which may have resulted from Barcroft's gun jamming. Detective Michael Mitchell arrived at the scene, and Barcroft volunteered to him, "I'm the one you're looking for." *Id*. at 171. Officers soon learned that Pastor Jaman had been pronounced dead at Wishard Hospital from a gunshot wound to his chest.

[9] Barcroft was taken into custody and placed in an interview room, where she initially stood with her face in the corner, raking her fingers through her hair or across her face. Detective Mitchell entered the room, told Barcroft to have a seat, and informed her that he was conducting an investigation. Detective Mitchell read Barcroft her *Miranda* rights, and when asked if she understood her rights, Barcroft nodded in the affirmative. Barcroft initially said it was "probably best" for her to remain silent and get a court-appointed attorney. *Appellant's Addendum* at 3. Barcroft asked if it would be "derogatory against" her or if it would harm her in any way if she spoke "ahead of time" to Detective Mitchell, to which he responded no. *Id*. at 3-4. Barcroft then volunteered that

she would "like to tell [Detective Mitchell] what happened" and, "I don't want a lawyer now, I want to give a statement." *Id.* at 4. Without Detective Mitchell asking any questions, Barcroft gave a lengthy narrative in which she admitted to having shot Pastor Jaman. *Id.* at 6, 9. Near the end of this statement, Detective Mitchell told Barcroft, "you understand that you have to be arrested for this . . . for at least some time period." *Id.* at 13. Barcroft replied, "I do understand that. . . . I actually planned on not getting caught, but I did." *Id.* Barcroft continued, "And like I said, I'm not some sort of murderer or anything." *Id.*

[10]     During her statement to Detective Mitchell, Barcroft disclosed a complex and extensive system of beliefs and delusions that the experts later categorized as paranoid and grandiose delusions associated with schizophrenia. *Tr.* at 309-10, 314. These began around 1999 or 2000, when Barcroft and her husband lived in Florida and took in a pregnant woman from Colombia. When the woman's baby was one year old, Barcroft traveled to Colombia for the baby's baptism, where she met the baby's father. Around this time, Barcroft and her husband divorced, and Barcroft claimed to have had an affair with the baby's father, whom she said was named "Rafael Medina" and she called "R" or "Rafa." *Appellant's Addendum* at 5. Barcroft believed that this man was the wealthiest man in the world and controlled most of the world's cocaine. Barcroft said that in 2007, R asked her to marry him, which made her a top queen in the Colombian mafia and also pitted Barcroft against R's enemies, including the Bush family. According to Barcroft, the Bush family was allied

with the Mexican Mafia and was involved in cocaine and human trafficking. Barcroft thought the Bush family had asked Osama Bin Laden to commit the September 11, 2001 terrorist attacks and had tried to kill President Obama in order to regain control of the White House. Barcroft stated she had twice intervened to save President Obama's life. Barcroft also said that R had a network of satellites and that they were being watched at that moment. Barcroft told Detective Mitchell, "I really love people and I hate what they're doin' to people . . . they're pissed off as well, 'cause I've stopped the human trafficking," and "[t]hey want me dead." *Appellant's Addendum* at 9.

[11]     Pastor Jaman was an integral part of Barcroft's delusional scheme in that she thought him to be in cahoots with the Bush family and the Mexican mafia. She told Detective Mitchell that Pastor Jaman was responsible for the death of her father in 2010; although his official cause of death was congestive heart failure, Barcroft claimed to have received a message that Pastor Jaman had caused her father to be smothered to death. Barcroft also believed that Jeb Bush had killed her grandmother and that they, meaning the Bush family and Pastor Jaman, had caused her grandson to be infected with Kawasaki disease. Barcroft further said that Pastor Jaman had been lying about her, to make people hate her and have her appear to be of a lower "Class" than she was "to get me killed." *Id*. at 5, 11-12. During her statement to Detective Mitchell, Barcroft also made the following statements regarding why she shot Pastor Jaman:

[12]          1. Jaman, who I shot . . . basically is the cause of all of this." *Id*. at 6.

2. "Nobody else can do this but me." *Id*.

3. "I'm not a killer, by the way, but I'm the only one that can do it." *Id*.

4. [U]ntil this time, I have committed nothing. I should be a free human being." *Id*.

5. "I'm the only one that could take care of Jaman." *Id*. at 9.

6. "[It] wasn't even vengeance for mys [sic] . . . he was gonna try to pick off my family one by one. Not himself, the people that act for him." *Id*.

7. "There are a lot of people with me that want Jaman dead, but the problem is if they say, because he, what he keeps doing is getting people killed. He lies and tells them I'm less than what I am. They come to kill me. In their little groups, their teams . . . He keeps doing this over and over and over and over again. And people keep getting killed . . . . Jaman's responsible for this." *Id*. at 11.

8. "I was told to do this." *Id*. at 12.

Barcroft's mental health records showed that she had been seen intermittently at Midtown Mental Health in Indianapolis between 2004 and 2006 and again between 2008 and 2010. At that time she was diagnosed with ADHD and prescribed Adderall, although the experts who evaluated her in her current case regarded her symptoms then as more suggestive of psychosis. *Tr*. at 258. Her records also reflected that, in 2007, Barcroft presented at Halifax Medical Center in Florida and was seen at the psychiatric ward where she claimed to have hitchhiked from Indiana, was dehydrated, and was afraid federal agents

were pursuing her. *Tr.* at 257-58. Despite these paranoid and possibly psychotic symptoms, Barcroft was not found to meet the criteria for involuntary commitment and only stayed at the psychiatric ward for three days. After Barcroft's arrest in the present case, she refused anti-psychotic medications and claimed that she did not suffer from a mental illness. *Tr.* at 321.

[21] On May 21, 2012, the State charged Barcroft with murder and sought a sentencing enhancement for the use of a firearm. On December 14, 2012, the trial court conducted a hearing on Barcroft's competence to stand trial and found her not competent to stand trial. The trial court ordered a mental health commitment, which resulted in a finding on March 10, 2013 that Barcroft had gained competence to stand trial. On January 27, 2014, Barcroft filed a notice of insanity defense. A bench trial was held on January 27, 2014 and March 5, 2014.

[22] Barcroft consistently maintained her delusional beliefs during interviews with court-appointed psychiatrist Dr. George Parker, court-appointed psychologist Dr. Don Olive, and defense psychologist Dr. Stephanie Callaway. Dr. Parker diagnosed Barcroft with delusional disorder, while Dr. Olive and Dr. Callaway diagnosed schizophrenia, paranoid type. *Tr.* at 25, 41; *Court's Ex.* 1 at 85. After evaluating Barcroft, all three of the doctors concluded that, based on her mental disease, she was unable to appreciate the wrongfulness of her conduct at the time she committed her offense. *Tr.* at 216, 278, 305. On March 14, 2014, the trial court issued its order finding Barcroft guilty but mentally ill of murder. In reaching its verdict, the trial court noted that expert testimony is merely

advisory and not conclusive on the issue of sanity and stated that it relied on demeanor evidence, Barcroft's statement to police, and advisory opinions of the doctors to arrive at its conclusion. *Appellant's App*. at 111. On April 17, 2014, the trial court sentenced Barcroft to fifty-five years, with forty-four years executed in the Department of Correction, six years executed in community corrections, and five years suspended with a two-year term of probation. Barcroft now appeals.

## Discussion and Decision

[23] Barcroft argues that the trial court erred in using her post-*Miranda* request for an attorney in its determination that she was sane at the time she committed her offense. At Barcroft's bench trial, she did not object to the use of her statement requesting an attorney. Errors not properly preserved during trial must constitute fundamental error to overcome waiver. *Barton v. State*, 936 N.E.2d 842, 852 (Ind. Ct. App. 2010), *trans. denied*. Fundamental error occurs only when the error constitutes a substantial, blatant violation of basic principles of due process rendering the trial unfair to the defendant. *Id*.

[24] In *Doyle v. Ohio,* the United States Supreme Court held that using a defendant's post-arrest, post-*Miranda* silence to impeach an exculpatory story told for the first time at trial violated the defendant's due process rights. 426 U.S. 610, 619 (1976). Our Supreme Court acknowledged the *Doyle* rule the same year in *Jones v. State,* 265 Ind. 447, 355 N.E.2d 402 (1976). *Doyle* rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used

against him and then using his silence to impeach an explanation subsequently offered at trial. *Teague v. State,* 891 N.E.2d 1121, 1124 (Ind. Ct. App. 2008). In *Wainwright v. Greenfield,* the United States Supreme Court extended the rule in *Doyle* to apply to the use of a defendant's post-arrest silence as evidence of sanity. 474 U.S. 284, 295 (1986). The Court concluded that there was no viable distinction between the use of the defendant's post-arrest silence for impeachment purposes and its use as evidence of the defendant's sanity. *Id.* at 292. Rather, "[i]n both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized." *Id.*

[25] Our Supreme Court had the opportunity to address *Doyle* and *Wainwright* in *Lynch v. State,* 632 N.E.2d 341 (Ind. 1994), and *Wilson v. State,* 514 N.E.2d 282 (Ind. 1987). In *Lynch,* the defendant had asserted his right not to be questioned without an attorney present at the beginning of his interrogation. *Lynch*, 632 N.E.2d at 343. A tape of the interrogation was admitted for the purpose of establishing the defendant's state of mind shortly after he shot his father, and the defendant's sanity was an issue in the trial. 632 N.E.2d at 341. In *Wilson,* the State elicited testimony as to the defendant's exercise of his right to remain silent and his right to consult with an attorney as evidence of the defendant's sanity. 514 N.E.2d at 283. Relying on *Doyle* and *Wainwright,* our Supreme Court reversed both of these convictions and remanded for new trials. *Lynch*, 632 N.E.2d at 343; *Wilson*, 514 N.E.2d at 283-84. We conclude that the same result is required here.

At trial, the State admitted the recording of Barcroft's statement to the police. The recording showed that, after Detective Mitchell read Barcroft her *Miranda* warnings, she said it was "probably best" for her to remain silent and get a court-appointed attorney. *Appellant's Addendum* at 3. In its verdict finding Barcroft guilty but mentally ill of murder, the trial court stated, "Initially, Defendant requested an attorney. This suggests some comprehension of her legal jeopardy." *Appellant's App.* at 112. Pursuant to *Doyle* and *Wainwright* and the Indiana cases applying those cases, any use of Barcroft's statements about requesting an attorney as evidence of her sanity is a violation of her Due Process rights. The trial court's verdict explicitly found Barcroft's request for an attorney as evidence supporting an inference of sanity. Because such evidence was clearly used to support the trial court's verdict that Barcroft was guilty but mentally ill, we find that such error constituted a substantial, blatant violation of basic principles of due process rendering the trial unfair to Barcroft. The trial court, therefore, committed fundamental error. We reverse Barcroft's conviction and remand for a new trial.

Although not raised on appeal, we wish to note our concern about the voluntariness of Barcroft's statement to the police. After she stated that she thought it would be best to obtain an attorney before making a statement, Barcroft asked if it would be "derogatory against" her or if it would harm her in any way if she spoke "ahead of time" to Detective Mitchell, to which the detective responded no. *Appellant's Addendum* at 3-4. Barcroft then volunteered that she would "like to tell [Detective Mitchell] what happened" and, "I don't

want a lawyer now, I want to give a statement." *Id*. at 4. Without Detective Mitchell asking any questions, Barcroft proceeded to give a lengthy narrative in which she admitted to having shot Pastor Jaman. *Id*. at 6, 9. We cannot make a determination here as to whether or not Barcroft's statement was voluntary, but on re-trial, we remand to the trial court to make such a determination.

[28] Reversed and remanded.

Crone, J., concurs.

Friedlander, J., concurs with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lori Ann Barcroft, | [Add Hand-down date] |
| *Appellant-Defendant,* | Court of Appeals Case No. 49A05-1405-CR-215 |
| v. | Appeal from the Marion Superior Court |
| | The Honorable Kurt M. Eisgruber, Judge |
| State of Indiana, | Cause No. 49G01-1205-MR-33537 |
| *Appellee-Plaintiff* | |

**Friedlander, Judge, concurring.**

[29]    I concur with my colleagues' conclusion that the trial court's consideration of Barcroft's post-*Miranda* request for counsel as evidence of her sanity amounts to fundamental error. I write separately to address an issue that I believe this conclusion compels us to address: did Barcroft prove by a preponderance of the evidence that she was insane?

[30]    Barcroft has raised two issues on appeal. First, Barcroft argues that the trial court erred in rejecting her claim of insanity. Second, Barcroft argues that the trial court's reliance on her post-*Miranda* request for counsel as evidence of her sanity was fundamental error. Finding the second issue dispositive, the Majority declines to address the first. I disagree that the second issue is fully dispositive of the case before us. Regardless of what we decide about her post-

*Miranda* request for counsel, if Barcroft prevails on her argument that she successfully established that she was insane at the time of the offense, she is entitled to the entry of a verdict of not responsible by reason of insanity and not subject to retrial. *See Galloway v. State*, 938 N.E.2d 699, 708 (Ind. 2010) (explaining that "[a] successful insanity defense results in the defendant being found not responsible by reason of insanity"). *See also* Ind. Code Ann. § 35-36-2-3 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly).

[31] Because I write separately, I will not delve into the full analysis of Barcroft's claim that she proved her insanity by a preponderance of the evidence. It suffices to say that the trial court's conclusion that Barcroft had not proved by a preponderance of the evidence that she was unable to appreciate the wrongfulness of her actions was not clear error. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) (explaining that "[a] convicted defendant who claims his insanity defense should have prevailed at trial is in the position of one appealing from a negative judgment, and we will reverse only when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed"). Although the three expert witnesses testified unanimously that Barcroft was insane, our Supreme Court has held that expert testimony is merely advisory and the fact-finder is free to disregard it. *See Galloway v. State*, 938 N.E.2d 699. In this case, the trial court, acting as the finder of fact, relied on Barcroft's demeanor before and after the

offense as well as her statement to Detective Mitchell to determine that she was able to appreciate the wrongfulness of her conduct. *Id.* at 712 (explaining that "[e]ven where there is no conflict among the experts and the lay witnesses, a finding that a defendant was sane at the time of the crime still may be sustained by probative demeanor evidence from which a conflicting inference of sanity may be drawn"). Barcroft's arguments with respect to the import of her demeanor and statement amount to requests to reweigh the evidence and draw inferences that she deems more reasonable than those drawn by the trial court. *See Fernbach v. State*, 954 N.E.2d 1080, 1085 (Ind. Ct. App. 2011) (explaining that "[o]n appeal, we will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even though 'more reasonable' inferences might have been made" (citation omitted)). Based on the evidence presented, I cannot conclude that the trial court's inferences were unreasonable or that its ultimate finding that Barcroft, although mentally ill, was able to appreciate the wrongfulness of her conduct was clearly erroneous. Subject to my view that we should address the issue concerning the preponderance of the evidence of Barcroft's insanity, I concur with the majority that the use of her post-*Miranda* request for counsel was fundamental error.