


FILED

Dec 03 2018, 3:01 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-CR-135

## Lori Barcroft
*Appellant (Defendant)*

–v–

## State of Indiana
*Appellee (Plaintiff)*

Argued: April 24, 2018 | Decided: December 3, 2018

Appeal from the Marion Superior Court
No. 49G04-1205-MR-33537
The Honorable Lisa F. Borges, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 49A05-1704-CR-844

**Opinion by Justice Massa**

Chief Justice Rush and Justice David concur.
Justice Goff dissents with separate opinion in which Justice Slaughter joins.

**Massa, Justice.**

The jurisprudence of the insanity defense in Indiana—spanning nearly two centuries—is deeply rooted in the Anglo-American legal tradition, marked by periodic policy changes to the standards for evaluating criminal responsibility. Throughout this evolution, one principle stands the test of time: Whether the defendant meets the standards of insanity is a question for the trier of fact, that "sole sentinel in the protection of both the rights of the accused and the welfare of society." *Hill v. State*, 252 Ind. 601, 616–17, 251 N.E.2d 429, 438 (1969). And in rendering its judgment, the factfinder—whether judge or jury—may consider *all* evidence relevant to the defendant's mental state. *Id.*

In this case, all three mental-health experts concluded that the defendant was legally insane at the time of the offense and could not appreciate the wrongfulness of her actions. No lay witnesses offered opinion testimony. The trial court rejected the insanity defense and relied on evidence of the defendant's demeanor in rendering its verdict of guilty but mentally ill (GBMI). Because the factfinder may discredit expert testimony and rely instead on other probative evidence from which to infer the defendant's sanity, we affirm the trial court's GBMI conviction.

## Facts and Procedural History

Born in 1965, Lori Barcroft grew up as an only child. The product of a generally stable family environment, she described her formative years as "great" and free of any physical or emotional abuse. Court's Ex. A, p. 4. She advanced through public school as an average student and, upon graduation, attended college where she studied nursing and psychology. Although she soon withdrew from her full-time studies to marry and raise a family, she continued with her coursework for the next twenty years, balancing several jobs along the way.

By the early 2000s, Barcroft's marriage had failed, leaving her in a state of depression. She sought counseling and underwent periodic mental-health evaluations on an outpatient basis. But other than ADHD, medical records indicate no formal diagnoses of a psychiatric disorder. Still, her

cognitive faculties continued to wane. And, in 2007, Barcroft—living then with her son, Jordan Asbury, and his wife Tamia—began to exhibit increasingly odd behavior. According to Asbury, his mother described seeing messages on the refrigerator, she became obsessed with the color of cars, and she often rambled nonsensical codes. This behavior progressively worsened after her father died in 2010.

Concerned with his mother's deteriorating mental health, and fearful for Tamia's life, Asbury confided in Jaman Iseminger, a pastor at the family's church. Pastor Jaman believed Barcroft needed prayers and hospitalization. And he urged Asbury to have his mother leave the home. Indeed, Barcroft moved out sometime in early 2012 to live with her mother.

Two or three months later, on the morning of May 19, 2012, Pastor Jaman was working in his church office. He had arrived early, having arranged to meet Jeff Harris, a church volunteer planning to lead a workshop that day. Just before 7:00 a.m., as Harris was preparing coffee in the church kitchen, he noticed someone walking alongside the building outside, dressed in black clothing and carrying a backpack.

Harris went outside to find this person—later identified as Barcroft—peering into a window of the church basement. When he approached her, Barcroft asked if Pastor Jaman was there. Harris reentered the church to find the pastor in his basement office, unaware that Barcroft had followed him into the building. With the pastor in tow, Harris then led the way back to where he had left the visitor. As they ascended the basement stairs, Barcroft stood waiting above at the landing. Harris walked past her, unsuspecting and without comment. Suddenly, a single gunshot shattered the early-morning silence. Harris turned to find Barcroft pointing a gun in his direction, commanding him to "Go. Go." Tr. Vol. II, p. 119.

Harris fled to safety as two more gunshots rang out. From the parking lot, he saw Barcroft run, "crouched down" along the building, and then disappear between two houses across the street. Tr. Vol. II, p. 123. Lisa Walden, another church volunteer, also witnessed Barcroft flee while covering her head with the hood of her black sweatshirt. Moments later, Pastor Jaman emerged from the church, gasping for help as he staggered

and then collapsed to the ground. By the time Harris and Walden reached him, Pastor Jaman had lost consciousness. The twenty-nine-year-old clergyman died soon after, having suffered a fatal gunshot wound to the chest.

When police arrived, a K-9 unit led them to a nearby area overgrown with vegetation. Barcroft, fully hidden under the brush, lay motionless despite an officer's order for her to surrender. On the second command, when police threatened to shoot, she finally emerged from her hiding spot. Quiet, calm, and cooperative with the officers, Barcroft relinquished her weapon and submitted to arrest. "I'm the one you're looking for," she told police. Tr. Vol. II, p. 142.

With Barcroft in custody, the lead detective informed her of the investigation and advised her of her *Miranda* rights. When asked if she understood these rights, Barcroft responded that she did. She then gave her statement, without prompting or questioning from the detective. The long, often unintelligible monologue that followed described a world in which Pastor Jaman—as part of a larger conspiracy involving drug smuggling and human trafficking by officials from the highest levels of the federal government—had plotted to kill her and her family. The pastor, she insisted, was an agent of the Mexican mafia who intended to "pick off" her family members "one by one," leaving her no choice but to kill him. Defendant's Ex. A1, p. 9. Still, Barcroft swore that she was "not some sort of murderer," noting that she had "actually planned on not getting caught." Defendant's Ex. A at 9:05:28–31, 9:05:36–37.

The State charged Barcroft with murder and sought a sentencing enhancement for the use of a firearm. *See* Ind. Code § 35-42-1-1 (2012) (murder); Ind. Code § 35-50-2-11 (2012) (sentencing enhancement). Barcroft invoked the insanity defense and waived her right to a trial by jury.[1]

---

[1] The trial court initially found Barcroft incompetent to stand trial but reversed that finding after evaluations during her commitment determined otherwise.

Three mental-health experts testified at Barcroft's bench trial: court-appointed psychiatrist Dr. George Parker, court-appointed psychologist Dr. Don Olive, and defense psychologist Dr. Stephanie Callaway. All three experts concluded that Barcroft was legally insane at the time of the offense and could not appreciate the wrongfulness of her actions. No expert found evidence of feigning or malingering.

Several eyewitnesses also testified at trial: the responding officers, the lead detective, and Harris and Walden. These witnesses—none of whom knew Barcroft prior to the day of the crime—testified only to the defendant's demeanor before, during, and just after the shooting.

The trial court judge found Barcroft GBMI,[2] sentencing her to fifty-five years with five years suspended to mental-health probation. While acknowledging Barcroft's "complex delusions," the court ultimately concluded that she understood the gravity of her crime. Tr. Vol. III, pp. 104, 107. In reaching this decision, the court relied on evidence of Barcroft's demeanor: her sophisticated plan to commit the crime, her self-restraint in waiting for Pastor Jaman at the church, her decision to spare the life of an eyewitness to the shooting, her later escape and attempt to hide, her cooperation with police, and her stated intent of avoiding arrest. The court also found that Barcroft had a "separate and conflicting motivation" for the crime, a motivation to avoid scrutiny of—and possible detention for—her mental illness because of Pastor Jaman's advice to her son.[3] *Id.* at 104.

---

[2] A verdict of guilty but mentally ill requires an evaluation and treatment of the defendant's mental illness during his or her incarceration "in such a manner as is psychiatrically indicated," but otherwise imposes the same criminal sentence as a standard conviction of guilt. Ind. Code § 35-36-2-5(a), (c). By contrast, a verdict of nonresponsibility by reason of insanity may result in the defendant's civil commitment if the trial court finds by clear and convincing evidence that the defendant is mentally ill and either dangerous or gravely disabled. I.C. § 35-36-2-4.

[3] This was the second time a court had found Barcroft GBMI. *See Barcroft v. State*, 26 N.E.3d 641 (Ind. Ct. App. 2015). After her first bench trial, the Court of Appeals reversed and remanded for a new trial, holding that the admission of Barcroft's initial request for counsel as evidence of sanity violated her due process rights. *Id.* at 646–47.

A divided Court of Appeals reversed. *Barcroft v. State*, 89 N.E.3d 448, 458 (Ind. Ct. App. 2017), *vacated*. The majority, relying on this Court's decision in *Galloway v. State*, 938 N.E.2d 669 (Ind. 2010), concluded that—absent evidence of malingering and because of Barcroft's history of mental illness and the unanimous expert opinion—"the demeanor evidence relied on by the trial court simply had no probative value." 89 N.E.3d at 457. The dissent, however, would have affirmed in deference to the factfinder, concluding that Barcroft's "demeanor, behavior, and statements before, during, and immediately after the crime," supported "a reasonable inference of sanity." *Id.* at 458.

We granted the State's petition to transfer, thus vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A). Additional facts follow in our discussion below.

## Standard of Review

A factfinder's determination that "a defendant was not insane at the time of the offense warrants substantial deference from" an appellate court. *Galloway*, 938 N.E.2d at 709. On review, we do not reweigh evidence, reassess witness credibility, or disturb the factfinder's reasonable inferences. *Myers v. State*, 27 N.E.3d 1069, 1074 (Ind. 2015). We will instead affirm the trial court's conviction unless "the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed." *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004).

## Discussion and Decision

To convict a criminal defendant, the State must prove each element of the offense beyond a reasonable doubt. Ind. Code § 35-41-4-1(a). But a defendant may avoid criminal responsibility by invoking the insanity defense. *Myers*, 27 N.E.3d at 1075. This plea requires the defendant to prove by a preponderance of the evidence (1) that she suffers from a "mental disease or defect" and (2) that the "mental disease or defect" rendered her unable to appreciate the wrongfulness of her conduct at the

time of the offense.[4] I.C. §§ 35-41-4-1(b), 35-41-3-6(a). Proof of mental illness alone is not enough. *Myers*, 27 N.E.3d at 1075.

There is no dispute here that Barcroft suffered from mental illness when she shot and killed Pastor Jaman. So, the question is whether, at the time of the shooting, she understood the wrongfulness of her actions.

## I. The Evidentiary Dimensions of the Insanity Defense

When a person invokes the insanity defense, all relevant evidence is admissible, including evidence which a court may otherwise find inadmissible.[5] *Garner v. State*, 704 N.E.2d 1011, 1014 (Ind. 1998). Most defendants attempt to satisfy their evidentiary burden through the testimony of expert witnesses. *Cate v. State*, 644 N.E.2d 546, 547 (Ind. 1994). But in deciding whether a defendant has met this burden, the factfinder may rely on other probative evidence, including lay opinion testimony and proof of demeanor.[6] *Galloway*, 938 N.E.2d at 712.

### A. Expert Testimony

Opinion testimony from psychiatrists, psychologists, and other mental-health experts is central to a determination of insanity. *Tyler v. State*, 250 Ind. 419, 423, 236 N.E.2d 815, 817 (1968). Through examinations, interviews, and other sources, these experts gather facts from which they

---

[4] Prior to 1984, a "mental disease or defect" did "not include an abnormality manifested only by repeated unlawful or antisocial conduct." I.C. § 35-41-3-6(b) (1982). The amended law, which remains in force today, expanded on this definition by describing the term as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception." Pub. L. No. 184-1984, § 1(b), 1984 Ind. Acts 1501, 1501 (codified at I.C. § 35-41-3-6(b) (2018)).

[5] Evidence is relevant if it tends to make a fact more or less probable than it would be without the evidence. Ind. Evidence Rule 401.

[6] Probative evidence is simply evidence that tends to prove or disprove a point of issue. Black's Law Dictionary 1397 (10th ed. 2014).

"draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior." *Ake v. Oklahoma*, 470 U.S. 68, 80 (1985). At trial, "they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question." *Id.* "Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state," mental-health experts "can identify the elusive and often deceptive symptoms of insanity and tell the jury why their observations are relevant." *Id.* (internal citations and quotations omitted). In short, their goal is to assist factfinders, "who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense." *Id.* at 81 (internal citations and quotations omitted).

Expert opinion provides "a strong justification for raising the insanity defense." *Cate*, 644 N.E.2d at 547. Their testimony, however, is purely advisory, not conclusive. *Id.* Indeed, once the expert offers an opinion, "*it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts.*" *Hill*, 252 Ind. at 617, 251 N.E.2d at 438 (internal quotation marks omitted). Even when experts are unanimous in their opinion, the factfinder may discredit their testimony—or disregard it altogether—and rely instead on other probative evidence from which to infer the defendant's sanity. *Galloway*, 938 N.E.2d at 710. This evidence may include lay testimony or demeanor evidence.

## B. Lay Testimony

"Opinion testimony is not the exclusive domain of experts." *McCall v. State*, 273 Ind. 682, 688, 408 N.E.2d 1218, 1222 (1980). Indiana courts have long admitted lay testimony about a defendant's sanity. *Id.* (citing *Doe ex dem. Sutton v. Reagan*, 5 Blackf. 217, 218 (1839)). Lay testimony—often from a family member, acquaintance, or other person with whom the defendant has interacted—is admissible not because of the witness's specialized knowledge but because of his or her particular experience with the defendant. *Id.* at 689, 408 N.E.2d at 1222; *Galloway*, 938 N.E.2d at 712.

Lay testimony is especially useful in identifying a defendant's "behavior before, during, and after a crime," and is often "more indicative of actual mental health at the time of the crime than mental exams conducted weeks or months later" by psychiatrists or other mental-health experts. *Thompson*, 804 N.E.2d at 1149. Ultimately, a factfinder need not "give more weight to the testimony of medical experts than to that of non-expert witnesses who state facts within their own knowledge." *Sanders v. State*, 94 Ind. 147, 149 (Ind. 1884). And it "is not for the court to pronounce as a matter of law which of the two classes of witnesses shall receive the greater weight. That is a question for the jury," *id.*, or, in this case, the judge sitting as factfinder. A conviction may stand based solely on lay testimony, even in the presence of conflicting expert opinion. *Barany v. State*, 658 N.E.2d 60, 63 (Ind. 1995).

## C. Demeanor Evidence

Indiana's test for insanity is a "purely cognitive" one, as it looks only to "what the defendant was thinking and whether he or she could appreciate the wrongfulness of his or her conduct."[7] *Galloway*, 938 N.E.2d at 714. But a factfinder may rely on circumstantial evidence of a defendant's actions and statements before, during, and after the crime to infer his or her mental state. Wayne R. LaFave, 1 Substantive Criminal Law § 8.3(b) (3d ed. 2017). And demeanor evidence may sufficiently prove a defendant's sanity, even when expert and lay witnesses conclude otherwise. *Galloway*, 938 N.E.2d at 712.

---

[7] The State's former "irresistible impulse" test, by contrast, included a volitional factor, which considered whether the defendant could "conform his conduct to the requirements of law." I.C. § 35-41-3-6(a) (1982), *repealed by* Pub. L. No. 184-1984, § 1, 1984 Ind. Acts at 1501. Because of this volitional component, demeanor evidence—whether in negating an insanity defense or in supporting it—carried more probative value than under the modern cognitive test. *See Galloway*, 938 N.E.2d at 714. By removing the volitional factor, the new law no longer excused those mentally-ill defendants who understood that it was "wrong to inflict bodily harm upon another person," but who, "owing to a mental derangement," were "incapable of controlling the impulse to commit such an act." *See Hill v. State*, 252 Ind. 601, 607, 251 N.E.2d 429, 433 (1969). In effect, the amendment significantly narrowed the substantive test for insanity.

As with lay testimony, evidence of demeanor is useful in identifying the defendant's mental health before, during, and after the crime. *Id.* Demeanor evidence is also helpful in determining whether the defendant is feigning mental illness. *Id.* But even with no apparent deception, this evidence may still be appropriate. *Id.* at 713 (citing *Barany*, 658 N.E.2d at 64).

## II. Weighing the Totality of the Evidence

Barcroft contends that it was contrary to law for the trial court to find her GBMI. In support of her argument, she points to (1) the unanimous agreement among the experts, (2) the lack of lay testimony, and (3) the lack of demeanor evidence sufficiently probative to show sanity. Her actions, she insists, "were motivated completely by her complex delusion," not by any threat Pastor Jaman may have posed in counseling her son. Appellant's Br. at 31.

The State, on the other hand, argues that Barcroft's conviction rests firmly on probative demeanor evidence reflecting her appreciation of the crime at the time of its commission. In urging us to affirm the trial court, the State also points to flaws or contradictions in the experts' opinion testimony.

For the reasons below, the State's argument prevails.

### A. Ample demeanor evidence supports the trial court's rejection of Barcroft's insanity defense.

Barcroft argues that *Galloway* dictates the outcome of this case. There, the trial court rendered a GBMI verdict despite unanimity among the experts that the defendant was insane. *Galloway*, 938 N.E.2d at 703. This Court reversed, concluding that the defendant's conduct on the day of the crime—shopping, eating, refueling his car, and cooperating with police—was "simply neutral and not probative of sanity" given the defendant's long history of mental illness. *Id.* at 715. In short, this Court, over the strong dissent of Chief Justice Shepard joined by Justice Dickson, found

"very little evidence" of the defendant's demeanor during the crime to support the trial court's conviction. *Id.*

Here, by contrast, we find ample demeanor evidence—before, during, and after the crime—to support the trial court's rejection of Barcroft's insanity defense.[8]

First, Barcroft exhibited deliberate, premeditated conduct in the weeks and days leading up to the crime: She asked another member of the church when Pastor Jaman planned to return from a mission trip. She purchased a handgun and waited for a permit. She prepared goodbye letters to members of her family. She packed several rounds of ammunition, a pair of binoculars, and other personal items in her backpack. And she planned to confront the pastor during the early morning hours, before the day's activities had started and to avoid potential witnesses. Barcroft's choice of clothing—black pants and a black, hooded sweatshirt—likewise show a calculated attempt to evade detection or to obscure her identity. *See Cate*, 644 N.E.2d at 548 (evidence showing defendant's "deliberation in accomplishing the killing" supported the factfinder's rejection of insanity defense).

Barcroft's actions during and right after the shooting also suggest a consciousness of guilt. As she spoke with Harris outside the church, she kept her handgun—a .22 caliber pistol—concealed in her front pocket. *See Jones v. State*, 825 N.E.2d 926, 930–31 (Ind. Ct. App. 2005) (finding that defendant's attempt to silence a gun used in shooting so that his "neighbors wouldn't hear it" supported the jury's rejection of the insanity defense), *trans. denied*. Even more revealing was her decision to spare Harris's life. Expert testimony suggested that this conduct reflected

---

[8] We acknowledge that evidence of the defendant's demeanor during the crime may have greater probative value than such evidence before and after the crime. *See Galloway*, 938 N.E.2d at 714. But neither *Galloway* nor any other decision from this Court has imposed strict temporal limitations on the utility of this evidence. And as the *Galloway* Court recognized, demeanor evidence "'*before, during, and after a crime* may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later.'" *Id.* at 712 (emphasis added) (quoting *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2010)).

Barcroft's delusional state, the inference being that a sane person would have shot the eyewitness to avoid criminal implication. But a factfinder could have reasonably come to the opposite conclusion: that Barcroft's decision not to shoot showed an understanding that killing is wrong. *See Carson v. State*, 807 N.E.2d 155, 160–61, 163 n.3 (Ind. Ct. App. 2004) (concluding that, just after the attempted murder, defendant's statement to eyewitness that "they had to leave" suggested sanity).

Cloaked by the hood of her sweatshirt, Barcroft then fled from the crime scene and attempted to hide, taking great pains to conceal herself under the foliage of an overgrown lot. She lay motionless in her hiding spot even as police ordered her to surrender, emerging only when an officer threatened to shoot. *See Myers*, 27 N.E.3d at 1077 (fleeing, hiding, and refusing to comply with police orders is probative of defendant's sanity).

Finally, when the detective asked whether Barcroft understood that she "ha[d] to be arrested" for her crime, she replied that she had "actually planned on not getting caught." This comment implies a consciousness of guilt. *See Lawson v. State*, 966 N.E.2d 1273, 1281 (Ind. Ct. App. 2012) (concluding that defendant's concern with going to jail if anyone discovered her crime was sufficiently probative of sanity), *trans. denied*.

We thus find the demeanor evidence more than sufficient to support the trial court's rejection of Barcroft's insanity defense. *Cf. Galloway*, 938 N.E.2d at 715 (finding "very little evidence" of the defendant's demeanor during the crime to support the trial court's conviction).

## B. Issues in the experts' opinion testimony likewise support the trial court's rejection of Barcroft's insanity defense.

Barcroft acknowledges that a factfinder may disregard or discredit the opinion testimony of a mental health expert. Still, she insists that the trial court, "by unreasonably disregarding the experts' unanimous conclusions," failed to properly consider the legislative intent behind Indiana Code section 35-36-2-2, the statute requiring court-appointed

experts in cases involving the insanity defense. Appellant's Br. at 47–49. This requirement, Barcroft contends, "speaks to the value our society places on verdicts being informed by the science of mental health." *Id.* at 48.

We agree that mental-health experts play an important role in cases involving the insanity defense. *See supra* Section I.A. But we refuse to elevate the value of expert opinion over other forms of probative evidence, as Barcroft would have us do. *See Thompson*, 804 N.E.2d at 1149; *Galloway*, 938 N.E.2d at 710.

Barcroft also overlooks another important reason for the statutory requirement: avoiding the so-called "battle of the experts." LaFave, 1 Substantive Criminal Law § 8.2(c). A court-appointed expert introduces an element of neutrality to the trial proceedings, countering the inherent bias of opinion testimony from experts retained by the opposing parties. *Id. See also* I.C. § 35-36-2-2 (the court shall appoint two or three "competent *disinterested*" mental-health experts) (emphasis added).

Even with the benefit of this statutory protection, psychiatry and psychology are imprecise sciences, and experts in these fields "disagree widely and frequently on what constitutes mental illness" and "on the appropriate diagnosis to be attached to given behavior and symptoms." *Ake*, 470 U.S. at 81. While each of the experts here ultimately agreed on Barcroft's insanity, their underlying diagnoses varied: Drs. Callaway and Olive diagnosed Barcroft with paranoid type schizophrenia. Dr. Parker, on the other hand, diagnosed her with delusional order of the persecutory type. And while Dr. Calloway observed signs of disorganized thought and behavior in Barcroft, Dr. Parker specifically premised his diagnosis on the absence of these symptoms. These conflicting diagnoses could have reasonably deprived the expert opinions of credibility in the eyes of the trial court. *See Satterfield v. State*, 33 N.E.3d 344, 349–51 (Ind. 2015) (conflicting diagnoses may support an inference of sanity); *Lawson*, 966 N.E.2d at 1281 (factfinder may consider discrepancies in expert opinion when rejecting the insanity defense).

The lapse in time between Barcroft's commission of the crime and the experts' mental-health examinations likewise could have discredited their

opinion testimony. *See Thompson*, 804 N.E.2d at 1149. Dr. Parker first met with Barcroft on September 18, 2012—four months after the crime had taken place. And Dr. Olive's examination took place even later, on October 2. Dr. Calloway examined Barcroft on July 20, much closer in time to the offense than the court-appointed experts. But even then, Dr. Calloway testified that Barcroft's mental health had deteriorated by the time they first met for the assessment.

Other issues with the experts' analysis could have reasonably led the trial court to refute the probative value of their opinion. For example, in preparing her report, Dr. Calloway failed to review psychiatric evaluations prepared at the time of Barcroft's arrest. The defense psychologist also admitted to not having reviewed Barcroft's statement to the detective before issuing her report and only later reviewing portions of the videotaped statement. Dr. Calloway also reviewed the eyewitness statements from Harris and Walden only in part and had no discussions with the officers present at the scene to corroborate evidence of Barcroft's demeanor. And yet despite these omissions in her analysis, Dr. Calloway acknowledged that demeanor evidence from the day of the crime is the "most reliable" evidence in determining a defendant's mental state. Tr. Vol. II, pp. 230–31.

Dr. Olive, for his part, appears to have conducted a thorough review of the records in preparing his report. He examined Barcroft's videotaped statement to the detective, the probable-cause affidavit, medical records from the Marion County Jail, and other material. But at trial, the court-appointed psychologist admitted his interview with Barcroft "was somewhat abridged" as she "did not wish to provide the type of detailed information that [he] would've liked at the time." *Id.* at 246. As a result, he acknowledged, "a large part, perhaps a disproportionate part," of his evaluation "consisted of the other sources of data." *Id.* at 248. Dr. Olive also noted that Barcroft, when asked whether she understood the wrongfulness of her conduct at the time of the offense, "didn't directly answer that to [his] satisfaction." Tr. Vol. III, p. 3.

As with Dr. Olive, Barcroft also declined to answer questions from Dr. Parker related to the events that took place on the day of the shooting. Dr.

Parker admitted to having reviewed only the probable-cause affidavit and Barcroft's interview with the detective, the former source containing no evidence of Barcroft's demeanor on the day of the crime. The court-appointed psychiatrist likewise failed to review the statement from Harris, the principal eyewitness to the shooting, to corroborate Barcroft's demeanor. Without this corroboration, the trial court could have placed greater weight on circumstantial evidence of Barcroft's actions at the time of the shooting. *See Johnson v. State*, 255 Ind. 324, 328, 264 N.E.2d 57, 60 (1970) (the factfinder may "take into consideration other facts which the psychiatrists did not consider").

Portions of the expert testimony could have also validated the trial court's finding that Barcroft had a motive for the crime. As Dr. Calloway attested, Barcroft knew that her son was acting on Pastor Jaman's advice when he asked her to leave the home and seek medical treatment. Barcroft saw this as an attempt to "brainwash the kids and the family," the doctor opined. Tr. Vol. II, p. 220. This testimony corroborates statements Barcroft made to police immediately following her arrest. As she explained to the detective, the pastor had infected the head of her son, who "believes every word Jaman says." Defendant's Ex. A at 8:47:30–37.

To be sure, Dr. Calloway attributed Barcroft's retaliatory motivation to her psychotic and delusional behavior. But the defense psychologist also acknowledged that, "even if people have delusions, they can also have a . . . logical reason for the behavior." Tr. Vol. II, p. 220. The other two experts made similar concessions. Dr. Olive admitted that Pastor Jaman's advice to Barcroft's son could have been a motivating factor for the shooting. And Dr. Parker, the court-appointed psychologist, admitted that a person's delusions "can coexist with the ability to make some rational decisions." Tr. Vol. III, p. 55. According to him, Barcroft "is able to function at some level, despite living in a delusional world." *Id.* at 56. It was "possibl[e]," he admitted, for Barcroft's anger toward Pastor Jaman to have been a rational response to his interference with her family. *Id.* at 56–57.

Taken together, the flaws, inconsistencies, and concessions in the experts' opinion testimony also support the trial court's rejection of

Barcroft's insanity defense.[9] *See Fernbach v. State*, 954 N.E.2d 1080, 1085 (Ind. Ct. App. 2011), *trans. denied*.

### C. Barcroft's history of mental illness provides little support for her insanity defense.

Finally, Barcroft argues that evidence of her demeanor at the time of the shooting is neutral and lacks probative value considering her long history of mental illness. We find little support for this argument.

Nothing in the record shows that Barcroft had ever been formally diagnosed with schizophrenia, delusional disorder, or other acute mental illness before her arrest and later evaluations. Her medical records show periodic psychiatric assessments on an outpatient basis between 2004 and 2010. During that time, doctors diagnosed her only with ADHD, describing her behavior as "agitated, irritable, and tangential." Court's Ex. A. p. 3. And doctors also characterized her as "grandiose with dissociative episodes." *Id.* But even then, they questioned whether she was in fact delusional. Psychiatric notes from a 2007 evaluation described Barcroft as "very paranoid with *questionable* schizophrenia" and with a "*questionable* history of ADHD." *Id.* (emphasis added). And without a formal diagnosis, doctors released her for failing to meet the standards for involuntary hospitalization.

Barcroft's statements during her initial psychiatric appraisal at the Marion County Jail, and during her evaluations with the experts, corroborate this history. She has consistently acknowledged her past symptoms of depression, diagnosis of and treatment for ADHD, and mental-health evaluations on an outpatient basis. She has also consistently denied experiencing symptoms of psychosis, insisting that there was "never any sign of mental illness." Court's Ex. B at 2. These statements suggest an awareness of her psychiatric history and tend to support her

---

[9] While emphasizing the experts' unanimity that Barcroft was legally insane at the time of the offense, the dissent does not address the weaknesses in their testimony as a factor supporting the trial court's findings.

claim that she "was of sound mind" at the time of the shooting. Court Ex. A at 7.

The lack of a well-documented history of mental illness—whether schizophrenia or other acute psychiatric disorder—does not necessarily preclude a finding of insanity. But "the lack of such history is a circumstance that a fact-finder may consider in evaluating an insanity defense." *Lawson*, 966 N.E.2d at 1282.

## Conclusion

In sum, we hold that evidence of Barcroft's demeanor—taken together with the flaws in the expert opinion testimony and the absence of a well-documented history of mental illness—was sufficient to support an inference of sanity. Although some evidence *could* have led to a contrary finding, we cannot say that the "evidence is *without conflict* and leads only to the conclusion that the defendant was insane when the crime was committed." *Galloway*, 938 N.E.2d at 710 (internal quotation marks omitted).

Affirmed.


Rush, C.J., and David, J., concur.

Goff, J., dissents with separate opinion in which Slaughter, J., joins.

**Goff, J., dissenting.**

As our legislature has recognized, when mental illness renders a person incapable of distinguishing right from wrong, the law excuses her would-be criminal conduct. This notion is foundational to our criminal justice system.

This case invokes that bedrock principle by presenting a simple question: was there sufficient demeanor evidence that Lori Barcroft was sane to create a conflict with three unanimous expert opinions that she was not. All three experts testified that Lori Barcroft could not appreciate the wrongfulness of her conduct the moment she shot Pastor Iseminger. But the trial court, and now the majority, rejected that unanimous expert opinion evidence in favor of dubious, non-probative demeanor evidence. In so doing, the Court today retreats from the stand we took in *Galloway*, where we said: "Thus, as a general rule, demeanor evidence must be considered as a whole, in relation to all the other evidence. To allow otherwise would give carte blanche to the trier of fact and make appellate review virtually impossible." *Galloway v. State*, 938 N.E.2d 699, 714 (Ind. 2010).

There is no doubt that Barcroft's conduct resulted in the senseless death of a beloved community leader. But she engaged in that conduct while suffering from complex delusions which, in the unanimous opinion of three mental health experts, rendered her incapable of distinguishing right from wrong. Unlike the majority, I would hold that the demeanor evidence—when considered in light of all other evidence, particularly the copious evidence of her chronic mental illness—is wholly consistent with the experts' unanimous conclusions that Barcroft was legally insane when she shot and killed Pastor Iseminger. For this reason, I respectfully dissent from the Court's judgment affirming her conviction and sentence.

# I. Indiana law distinguishes the insanity defense from other statutory defenses by requiring expert opinion evidence.

Indiana law will not punish people who are not culpable for their crimes, *Cate v. State*, 644 N.E.2d 546, 547 (Ind. 1994)—including those who cannot appreciate the wrongfulness of their conduct. The Indiana Code, culling from the centuries-old common law, has set the insanity defense apart from other criminal defenses. It is the one defense where the trial court must appoint "two (2) or three (3) competent disinterested psychiatrists, psychologists . . . , or physicians" who then must "examine the defendant and testify at the trial." Ind. Code § 35-36-2-2(b) (2008 Repl.). The legislature even specifies when the experts are to testify at trial—after the State's and defense's cases-in-chief. *Id.* And since our 2010 *Galloway* opinion, the legislature amended that section, adding the requirement that court-appointed psychiatrists, psychologists, or physicians "have expertise in determining insanity." I.C. § 35-36-2-2(c) (2018). *See also* Pub.L. 54–2014, § 1, 2014 Ind. Acts 524. Clearly, Indiana places great importance on expert opinion evidence when a defendant invokes an insanity defense.

# II. Our *Galloway* opinion explained both the limited value of demeanor evidence and how to measure its sufficiency to support rejection of unanimous expert opinion evidence of insanity.

Our *Galloway* opinion reinforced the importance of expert opinion evidence without abdicating the factfinder's role as final arbiter of the defendant's sanity. Recalling Indiana's settled, cautionary rule that experts do not provide the final word in sanity determinations, we explained that expert opinion "assist[s] the trier of fact in determining the defendant's insanity" and therefore is "merely advisory, and even unanimous expert testimony is not conclusive on the issue of sanity." *Galloway*, 938 N.E.2d at 709. Yet we also recognized the significant role experts play in these

decisions, effectively making unanimous expert opinions that a defendant could not appreciate the wrongfulness of her conduct a rebuttable presumption of insanity. Indeed, we instructed: "Where there is no conflict among the expert opinions that the defendant was insane at the time of the offense, there must be other evidence of probative value from which a conflicting inference of sanity can be drawn." *Id.* at 712.

*Galloway*'s significance cannot be understated. Following a string of decisions where this Court held the defendant was sane despite nonconflicting expert testimony that he was insane, *Galloway* returned the insanity defense to solid jurisprudential ground. *See id.* at 709–10. It provides guidance to bench and bar for evaluating a defendant's insanity defense at the trial and appellate levels when the experts agree that the defendant was insane when she committed the offense. The case instructs that to disregard unanimous expert opinions, there must be other probative evidence (either lay opinion testimony or demeanor evidence) that conflicts with those expert opinions. With this direction, *Galloway* provided an inflection point for the insanity defense generally and the demeanor-evidence evaluation specifically.

Under *Galloway*, demeanor evidence still represents the defendant's conduct before, during, and after the offense—what she did. Yet, "[d]emeanor evidence requires the trier of fact to infer what the defendant was thinking based on his or her conduct." *Id.* at 713.

*Galloway* observed there are two ways to use demeanor evidence in evaluating a defendant's sanity. First, "[d]emeanor [evidence] is useful because a defendant's 'behavior before, during, and after a crime may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later.'" *Id.* at 712 (second alteration in original) (citation omitted). Second, "[d]emeanor evidence may be most useful where there is some indication that the defendant is feigning mental illness and insanity." *Id.*

But just as *Galloway* recognized the utility of demeanor evidence, we also discussed its four limitations. First, demeanor evidence's value is limited when a defendant has a long history of mental illness marked by psychosis because it is difficult to parse what is normal or abnormal

behavior for that defendant. *Id.* at 713. Second, its value is limited because it can be used only to discern what the defendant was thinking at the time of the offense. *Id.* at 714. Indeed, *Galloway* explained that demeanor evidence had more probative value when Indiana's insanity defense included a volitional (irresistible impulse) component that emphasized what the defendant did. *Id.* Third, demeanor evidence is most valuable when limited to the defendant's demeanor during the crime. *Id.* (stating "demeanor evidence before and after a crime is of more limited value than the defendant's demeanor during the crime"). Fourth, demeanor evidence cannot be considered in isolation, but "must be considered as a whole, in relation to all the other evidence." *Id.*

Recognizing these limitations, *Galloway* considered whether there was sufficient demeanor evidence to undermine the unanimous expert opinions that the defendant was legally insane when he murdered his grandmother. *Id.* at 714–16. The Court said no, employing a test I would apply here to reach the same conclusion: "[W]hen viewed against the defendant's long history of mental illness . . . the defendant's demeanor during the crime . . . and the absence of any suggestions of feigning or malingering, this demeanor evidence is simply neutral and not probative of sanity." *Id.* at 715.

## III. There is insufficient demeanor evidence to support the trial court's rejection of Barcroft's insanity defense.

This case, like *Galloway*, turns upon whether there was sufficient demeanor evidence to establish a conflict with the experts' opinions that Barcroft was insane when she shot Pastor Iseminger. I would follow *Galloway*'s approach and find the demeanor evidence provided was insufficient to create such a conflict.

Here the record shows all experts testified Barcroft suffered under complex delusions. Dr. Callaway stated: "I've seen a handful of situations where the psychotic delusions are that complex. But she is . . . one of the more complex systems that I've ever seen." Tr. Vol. II, p. 188, lines 23–25.

Dr. Olive testified that Barcroft suffered from "paranoid delusions, and . . . grandiose delusions." *Id.* at 249, lines 6–7. Dr. Parker agreed:

> Well, you . . . have to understand that her behaviors are driven by the delusions themselves. So if she's convinced with complete certainty, absolute certainty, that she is the nexus of this complex grandiose delusional scheme which involves the Columbian [sic] cartels, Mexican mafia, the Bush family, satellites in the sky, her family being at risk of being killed, herself at risk, well, then taking actions to keep yourself safe, to prevent harm from coming to you or your family, that becomes rational in that context.

Tr. Vol. III, pp. 46–47. Each expert went on to testify that these delusions prevented Barcroft from appreciating that it was wrong to shoot Pastor Iseminger. Tr. Vol. II, p. 185, lines 22–24, p. 249, lines 4–8; Tr. Vol. III, pp. 21–22.

## A. The record provides scant demeanor evidence.

By contrast to these unanimous expert opinions, there is very little demeanor evidence here, very little of what Barcroft did during the crime that opens the window to what she was thinking, as the State astutely acknowledged at oral argument, explaining:

> Here the . . . evidence that we're mostly talking about as demeanor evidence isn't necessarily demeanor evidence, it's actually evidence of the crime. It's evidence of what she did, which is a little different than demeanor. The demeanor evidence typically is what you say and how you communicate with other people, how you're presenting yourself . . . .

Oral Argument at 21:57–22:14. But the majority doesn't heed the State's warning and broadens demeanor evidence to include what Barcroft did weeks before and hours after the murder. So, what exactly was the actual demeanor evidence here?

One witness testified that Lori Barcroft—clad in all black—asked if Pastor Iseminger was in the church. After that witness led her into the building, she calmly shot the pastor and then looked at the witness and told him, "Go. Go.", before she shot the pastor again. This is the only evidence of what Barcroft did during the crime, and it doesn't provide much insight into what she was thinking. It certainly doesn't show that she appreciated the wrongfulness of her conduct at that moment.

When compared to the unanimous expert opinions, this scant demeanor evidence here appears even thinner.

## B. The scant demeanor evidence provided is of little value.

Recall, under *Galloway*, demeanor evidence's utility increases when there is evidence that the defendant is feigning mental illness and decreases when the defendant actually suffers a long history of psychotic mental illness. The demeanor evidence here provides little value because there was no indication that Barcroft feigned or malingered her longstanding and well-documented mental illness. Tr. Vol. II, pp. 204–05; Tr. Vol. III, pp. 12, 41–43. Further, unlike the majority, I find that the record contains ample evidence that Barcroft suffered a long history of mental illness.

Barcroft long suffered from paranoid delusions and seemingly everyone in her life, including the victim of her crime, thought she needed professional medical care for her mental illness. Although the majority notes that she received periodic psychiatric assessments between 2004 and 2010, *see* Slip Op., p. 16, it omits the fact that she received "outpatient treatment in Florida, at St. Vincent from 1996 to 1999, and Midtown since 2000." Court's Ex. B, p. 2. The majority fails to note that Barcroft took stimulant medication to treat attention deficit hyperactivity disorder beginning in 1997 until mid-2003. *Id.* In 2005, after disclosing delusions to her therapist, she "started on Neurontin, a mood-stabilizing medication." *Id.* at 3. The last page in her record from Midtown, where she was treated between 2000 and 2008, is a note saying her parents appeared in person to request an emergency detention order, fearing for their daughter's safety. *Id.* Barcroft also received in-patient services at Halifax Medical Center

between November 4 and 7, 2011. But she did not meet the criteria for involuntary hospitalization. Court's Ex. A, p. 5. The majority also leaves out the fact that Barcroft "reported a history of depression, bipolar disorder, and alcohol abuse in her father," *id.* at 6, which is at least as relevant as the fact that she grew up in a home free of abuse, *see* Slip Op., p. 2.

Everyone in Barcroft's life thought she had a mental illness and needed professional help. Her mother indicated to a doctor that "Ms. Barcroft experienced significant deterioration in her mental status when she moved to Florida with her husband as of approximately 2000." Court's Ex. A, p. 4. Barcroft's son indicated that his mother experienced significant deterioration in her mental health in approximately 2007. *Id.* Most notably around that time, she "was seeing messages on the refrigerator, and was obsessed with the color of cars." *Id.* According to the majority, the Pastor at her church, the ultimate victim in this case, "believed Barcroft needed prayers and hospitalization." Slip Op., p. 3.

The facts paint a clear picture of Barcroft as someone in denial of her mental illness and who did not meet the legal requirements for involuntary commitment. But she had been in and out of treatment and on and off different medications for roughly 15 years at the time of her offense, and every person in her life believed she needed professional help. This compelling evidence of Barcroft's chronic mental illness further devalues the demeanor evidence the majority relies upon.

Strict adherence to *Galloway* demands that we view the demeanor evidence through the lens of Barcroft's mental illness. *Galloway*, 938 N.E.2d at 715 (viewing demeanor evidence "against the defendant's long history of mental illness with psychotic episodes"). To be sure, neither trial nor appellate courts may isolate the demeanor evidence from the record evidence of mental illness. *Id.* at 714 ("[D]emeanor evidence must be considered as a whole, in relation to all the other evidence."). And so, considering the demeanor evidence as a whole with all the evidence of her complex delusions, her mental illness, and the unanimous expert opinions, I would hold that this neutral, non-probative demeanor evidence does not

create a conflict with the experts' opinions that Lori Barcroft was insane at the time of the shooting.

## C.  The scant demeanor evidence provided also supports a determination that Barcroft was insane.

Even if I could expand what *Galloway* says constitutes useful, probative demeanor evidence—as the majority does here—by considering Barcroft's planning, preparation, her clothing, hiding her gun, sparing Harris's life, and fleeing from police, I still cannot agree that this "evidence [is] more than sufficient to support the trial court's rejection of Barcroft's insanity defense." Slip op., p. 12. The majority's wide collection of demeanor evidence fits too well into Barcroft's complex delusions to create a conflict with the expert opinions that she was insane. In other words, the demeanor evidence the majority cites is neutral at best because it points just as fairly to insanity as it does to sanity for this particular defendant.

And unlike the majority, I'm hesitant to count Barcroft's flight from police as probative demeanor evidence. My hesitation is threefold. First, it is difficult, if not impossible, to separate Barcroft's behavior from her complex delusions that she was a Colombian mafiosa trying to settle a drug feud, avenge her father's death, and protect her family. Second, *Galloway* cautioned that evidence of flight is not valuable evidence of sanity since the opposite (staying and waiting for police) can also suggest sanity. *See* 938 N.E.2d at 714 (comparing cases). Third, I believe *Galloway* signals courts to elevate what the defendant did during the crime over what she did afterwards. *Id.* at 714.

Accordingly, whether applying *Galloway*'s measured evaluation of demeanor evidence or the majority's expanded approach, I would reverse the trial court's guilty-but-mentally-ill verdict and remand with instructions for the trial court to enter a not-responsible-by-reason-of-insanity verdict.

# Conclusion

Indiana's insanity defense stands apart from other criminal defenses, and rightly so. It would be unjust to punish a person suffering from a mental disease or defect that prevented her from appreciating the wrongfulness of her conduct. And so Indiana law requires that mental health experts aid factfinders in sanity determinations. While judges and juries sit as the final authorities on a defendant's sanity, our *Galloway* opinion instructs that their authority cannot, and should not, go unchecked. In my view, the majority loosens *Galloway*'s limitations on demeanor evidence and thereby erodes Indiana's insanity defense. I respectfully dissent.

Slaughter, J., joins.

ATTORNEYS FOR APPELLANT
Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Stephen R. Creason
Larry D. Allen
Deputy Attorneys General
Indianapolis, Indiana