

FILED

Sep 20 2023, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

J. Everett Newman III
Newman and Newman Law LLC
Albion, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Alexandria Sons
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Autumn B. Stahl,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 20, 2023

Court of Appeals Case No.
23A-CR-143

Appeal from the Koskiusko
Superior Court

The Honorable Karin A. McGrath,
Judge

Trial Court Cause No.
43D01-2008-F3-542

**Opinion by Judge Pyle**

Judges Vaidik and Mathias concur.

**Pyle, Judge.**

## Statement of the Case

A jury found Autumn Stahl ("Stahl") guilty but mentally ill of Level 3 felony attempted aggravated battery,[1] Level 5 felony battery with a deadly weapon,[2] Level 6 felony neglect of a dependent,[3] and Level 6 felony domestic battery.[4] On appeal, Stahl argues that the jury erred in rejecting her insanity defense. She also argues that there is insufficient evidence to support her convictions of Level 3 felony attempted aggravated battery and Level 5 felony battery with a deadly weapon. We conclude that based on the evidence presented at trial, it was possible for a jury to have made a reasonable inference that Stahl was mentally ill but still able to understand the wrongfulness of her conduct. Accordingly, we find no error in the jury's rejection of her insanity offense. We also conclude that there is sufficient evidence to support Stahl's convictions of Level 3 felony attempted aggravated battery and Level 5 felony battery with a deadly weapon and, therefore, affirm the trial court's judgment.

We affirm.

## Issues

1.  Whether the jury erred in rejecting Stahl's insanity defense.

---

[1] IND. CODE §§ 35-42-2-1.5 and 35-41-5-1(a).

[2] I.C. § 35-42-2-1(g)(2).

[3] I.C. § 35-46-1-4.

[4] I.C. § 35-42-2-1.3(b)(2).

2.     Whether there is sufficient evidence to support Stahl's convictions of Level 3 felony attempted aggravated battery and Level 5 felony battery with a deadly weapon.

## Facts

[3]     The facts most favorable to the verdict reveal that Stahl and Stephen Blair ("Blair") began dating in 2016.  At the time, Stahl had two young children from a previous relationship.  Although Stahl and Blair moved in together in 2017, their relationship was "challenging" because Stahl "consistently [had] emotional problems and insecurities[,]" and when she felt overwhelmed, she became "irrational [and was] [l]ike a pinball bouncing off . . . everywhere." (Tr. Vol. 2 at 177, 180, 181).

[4]     During the course of their relationship, Stahl gave birth to three children.  The youngest child, A.A. ("A.A."), was born in June 2020.  Following A.A.'s birth, Stahl became "more irrational." (Tr. Vol. 2 at 182).  At the end of July 2020, Stahl and Blair were arguing so much that Blair moved out of their house.

[5]     On August 1, 2020, Stahl visited Blair at a house that he was renovating.  Blair noticed that Stahl was "acting weird.  Stranger than normal." (Tr. Vol. 2 at 182).  She "was just like very frantic and aggressive[.]" (Tr. Vol. 2 at 183).  After Stahl had left this house, Blair, who was concerned about Stahl's behavior, went to the house where Stahl and the children were living to check on Stahl.  Blair first looked through a window and saw Stahl and one of her older children walking naked around the house.  Blair also noticed that the living room was a "complete mess[.]" (Tr. Vol. 2 at 191).  There was flour all

over the floor and "[j]ust stuff everywhere like somebody [had] just ripped apart the house." (Tr. Vol. 2 at 191).

[6]     Blair entered the house and found most of the children in the bathtub. Stahl asked Blair to give the children a bath and went into the bedroom with A.A. While giving the children a bath, Blair smelled something burning. He went into the bedroom and saw smoke rising up to the ceiling from a burning pillow on the bed. Stahl was sitting on the bed about three feet from the burning pillow. She was rocking A.A. and singing to him. Blair grabbed the burning pillow and threw it outside.

[7]     Blair then noticed Stahl walking towards the kitchen with A.A. in her arms. Stahl entered the kitchen and turned on the stove's gas burners. Blair turned off the burners, and Stahl turned them on again. Stahl then turned on the kitchen faucet, "put her thumb inside of [A.A.]'s mouth . . . to hold his mouth open[,]" and placed A.A.'s face under the running water. (Tr. Vol. 2 at 193).

[8]     Blair, who was a former Marine, placed Stahl in a hold and lowered her to the ground. A.A. fell to the floor, and Stahl picked up a knife with a four-inch blade and plunged it two to three inches into "a fatty area of [Blair's] neck." (Tr. Vol. 2 at 194). Stahl also bit Blair several times. Blair went to the front door and yelled for help. While Blair was at the front door, Stahl picked up A.A. and "kept continuing to drown him underneath the faucet[.]" (Tr. Vol. 2 at 213).

[9] Several neighbors entered the house and helped Blair take the older children, who had gotten out of the bathtub and had witnessed the incident in the kitchen, across the street to a neighbor's garage. One of the neighbors saw Stahl standing in front of the kitchen sink. She was "shoving her fingers down [A.A.]'s throat." (Tr. Vol. 2 at 227). The neighbor approached Stahl and asked her to hand him the infant. Stahl complied with the neighbor's request, and the neighbor took A.A. across the street where Blair and the other children had gathered.

[10] Department of Natural Resources Officer Matthew Maher ("Officer Maher") was the first law enforcement officer to arrive at the scene. He observed Stahl standing on the front porch near the front door to her house. Stahl was shouting at Blair, who was standing across the street. When Stahl heard the sirens from approaching law enforcement vehicles, she "began to slowly retreat" into the house and attempted to close the front door. (Tr. Vol. 2 at 244). Officer Maher believed that Stahl was aware that law enforcement officers were arriving "to take [her] into custody because she had done something wrong." (Tr. Vol. 3 at 3). To prevent Stahl from barricading herself inside the house, Officer Maher kicked the front door. Officer Maher then entered the house, grabbed Stahl by the wrist, and "guide[d] her down to kind of like a bear crawl position on all fours[.]" (Tr. Vol. 2 at 247). Stahl grabbed a nearby curtain rod and began striking Officer Maher with it. When Officer Maher noticed that Stahl was reaching for a nearby knife, Officer Maher brought Stahl "down to a prone position on the floor." (Tr. Vol. 2 at 248).

[11]     Shortly thereafter, Pierceton Police Department Officer Ryan Piper ("Officer Piper") arrived at the scene. Officer Piper was wearing a bodycam, which recorded his interaction with Stahl. Officer Piper entered the house with a Taser and told Stahl that she had "better calm down or [he was] gonna tase [her]." (Tr. Vol. 3 at 2). Stahl's demeanor changed, and she immediately became "completely docile." (Tr. Vol. 3 at 5). Officer Maher believed that Stahl had "understood that she did not want to get tased as most people would not." (Tr. Vol. 3 at 5). When paramedics arrived and attempted to carry Stahl out of the house in a blanket, Stahl told the paramedics to be careful because had recently had a C-section. Paramedics transported Stahl to the hospital.

[12]     Kosciusko County Sheriff's Office Detective Sergeant James Marshall ("Detective Marshall") arrived at the hospital that night to interview Stahl. Detective Marshall videotaped the interview. At the beginning of the interview, Stahl began crying, and Detective Marshall allowed her the opportunity to calm down. Another officer entered the room and told Stahl that A.A. had been examined at the hospital and was fine. Stahl stopped crying and calmly told Detective Marshall that she would cooperate with him. Stahl then told Detective Marshall that she had not slept in eight days and that she no longer wanted to talk to him because she needed some rest.

[13]     Four days later, Detective Marshall interviewed Stahl again at the Sheriff's Department. Detective Marshall also taped this second interview. Stahl recognized Detective Marshall from the previous interview, apologized to him for not talking to him during that interview, and told him that she had just

needed some rest.  Stahl told Detective Marshall that she was going to be honest with him.  Stahl explained that she has five children, her oldest son has autism, she has no support, and before the incident involving A.A. and Blair, she had not slept for eight days.  In addition, Stahl explained that she had not been "in her right mind" during the incident and that she had never intended to hurt Blair or any of her children.  (Ex. Vol. 6, State's Ex. 14).  Stahl further explained that she had simply been "delirious from lack of sleep."  (Ex. Vol. 6, State's Ex. 14).

[14]  The State charged Stahl with Level 3 felony attempted aggravated battery, Level 5 felony battery with a deadly weapon, Level 3 felony aggravated battery, Level 6 felony domestic battery, and two counts of Level 6 felony neglect of a dependent.  Stahl was subsequently admitted to Parkview Behavioral Health, where she was diagnosed with PTSD, post-partum depression, and post-partum psychosis.  Stahl's attorney filed a notice of defense of mental disease or defect and a motion for a psychiatric evaluation to determine Stahl's sanity or insanity at the time of the offenses.  The trial court granted Stahl's motion and appointed a psychiatrist and a psychologist to examine Stahl.

[15]  Psychologist Dr. Bryan Ciula ("Dr. Ciula") examined Stahl in June 2021, ten months after the events that had transpired in Stahl's home.  According to Dr. Ciula, Stahl had been receiving services from the Bowen Center since 2017, but no one had been able to determine her primary diagnosis.  Although Dr. Ciula reviewed police reports about the case, he did not question Stahl about the incident because he did not want to include in his report anything that could be

incriminating to Stahl. Dr. Ciula concluded that Stahl "suffer[ed] from mental disease or defect which render[ed] her unable to sufficiently appreciate the wrongfulness of her conduct at the time of the alleged offenses." (Ex. Vol. 5 at 30).

[16] Psychiatrist Dr. Andrew Smith ("Dr. Smith") examined Stahl in September 2021, more than one year after the incident in Stahl's home. Dr. Smith reviewed the police reports but did not watch Officer Piper's bodycam footage or Detective Marshall's two interviews with Stahl. In addition, he did not speak with anyone other than Stahl. Dr. Smith, like Dr. Ciula, concluded that Stahl "suffer[ed] from mental disease or defect which render[ed] her unable to sufficiently appreciate the wrongfulness of her conduct at the time of the alleged offenses." (Ex. Vol. 5 at 24).

[17] The jury heard the evidence as set forth above at Stahl's three-day jury trial in August 2022. In addition, the trial court admitted into evidence the recording from Officer Piper's bodycam as well as the recordings of Detective Marshall's two interviews with Stahl. The trial court also admitted into evidence a photograph of the knife that Stahl had used to stab Blair in the neck.

[18] At the conclusion of the evidence, the jury rejected Stahl's insanity defense and found her guilty but mentally ill of Level 3 felony attempted aggravated battery, Level 5 felony battery with a deadly weapon, Level 6 felony domestic battery, and Level 6 felony neglect of a dependent. In addition, the jury acquitted Stahl of Level 3 felony aggravated battery and the second count of Level 6 felony

neglect of a dependent. The trial court sentenced Stahl to a nine-year aggregate sentence in the Department of Correction.

[19] Stahl now appeals.

## Decision

[20] Stahl argues that the jury erred in rejecting her insanity defense. She also argues that there is insufficient evidence to support her convictions of Level 3 felony attempted aggravated battery and Level 5 felony battery with a deadly weapon. We address each of her contentions in turn.

### 1. Insanity Defense

[21] Stahl first argues that the jury erred in rejecting her insanity defense. To convict a criminal defendant, the State must prove each element of the offense beyond a reasonable doubt. IND. CODE § 35-41-4-1(a). However, a defendant may avoid criminal responsibility if she can successfully raise and establish an insanity defense. *Myers v. State*, 27 N.E.3d 1069, 1075 (Ind. 2015); *see also* IND. CODE § 35-41-3-6(a). To successfully assert this defense, the defendant must prove by a preponderance of the evidence (1) that she suffers from a "mental disease or defect"[5] and (2) that the "mental disease or defect" rendered her unable to appreciate the wrongfulness of her conduct at the time of the offense. I.C. §§

---

[5] INDIANA CODE § 35-41-3-6(b) defines a mental disease or defect as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct."

35-41-4-1(b) and 35-41-3-6(a). Proof of mental illness alone is not enough. *Myers*, 27 N.E.3d at 1075. "Rather, a defendant who is mentally ill but fails to establish that he or she was unable to appreciate the wrongfulness of his or her conduct may be found guilty but mentally ill[.]" *Galloway v. State*, 938 N.E.2d 699, 708 (Ind. 2010).

[22] Because the jury rejected Stahl's insanity defense, Stahl is appealing from a negative judgment and faces a heavy burden. *See id*. at 709. Further, the jury's determination that a defendant was not insane at the time of the offense warrants substantial deference from an appellate court. *Id*. On review, we do not reweigh evidence, reassess witness credibility, or disturb the jury's reasonable inferences. *Id*. Rather, we will affirm the convictions unless the evidence is without conflict and leads only to the conclusion that the defendant was insane when she committed the offenses. *Barcroft v. State*, 111 N.E.3d 997, 1002 (Ind. 2018).

[23] In making a sanity determination, the jury may consider all relevant evidence. *Id*. "Most defendants attempt to satisfy their evidentiary burden through the testimony of expert witnesses[,]" including psychiatrists, psychologists, and other mental health professionals. *Id*. at 1003. However, the testimony of these expert witnesses "is purely advisory, not conclusive[.] Even when experts are unanimous in their opinion, the factfinder may discredit their testimony – or disregard it altogether – and rely instead on other probative evidence from which to infer the defendant's sanity." *Id*. This other probative evidence may include testimony from lay witnesses, which can be useful in identifying the

defendant's behavior before, during, and after a crime. *Id.* In addition, such testimony may be more indicative of the defendant's mental health at the time of the crimes than mental health examinations that occur weeks, months, or even years later. *Id.* The jury may also rely on circumstantial evidence of a defendant's actions and statements before, during, and after the crimes to infer her mental state. *Id.* at 1004. "And demeanor evidence may sufficiently prove a defendant's sanity, even when expert and lay witnesses conclude otherwise." *Id.*

[24] Here, our review of the evidence leads us to conclude that a reasonable jury could have inferred that Stahl was able to appreciate the wrongfulness of her conduct at the time of the offenses. First, Stahl's attempt to avoid arrest by retreating into her house when she heard sirens tends to show guilt. *See Myers*, 27 N.E.3d at 1077 (explaining that evidence of an attempt to avoid arrest tends to show guilt). Further, Stahl's compliant demeanor after Officer Piper threatened to tase her and her request that the paramedics be careful when carrying her out of the house was evidence from which the jury could have reasonably inferred that Stahl had been able to appreciate the wrongfulness of her conduct at the time of the offenses. In addition, when Stahl met with Detective Marshall shortly after arriving at the hospital, Stahl calmly told Detective Marshall that she would cooperate with him. She subsequently told him that she had not slept for eight days and needed to rest. Four days later, Stahl recognized Detective Marshall from the previous interview, apologized to him for not talking to him during that interview, and explained that she had just

needed some rest. Stahl further told Detective Marshall that she was going to be honest with him. Stahl explained that she had not been in her right mind during the incident and that she had never intended to hurt Blair or any of her children. Stahl further explained that she had simply been delirious from lack of sleep. Based on Stahl's interviews with Detective Marshall, the jury could have reasonably inferred that Stahl had been able to appreciate the wrongfulness of her conduct at the time of the offenses.

[25] Further, although both Dr. Smith and Dr. Ciula concluded that Stahl suffered from a mental disease or defect that had rendered her unable to appreciate the wrongfulness of her conduct at the time of the offenses, Dr. Smith examined Stahl more than a year after the incident in her home. Further, Dr. Smith did not watch Officer Piper's bodycam footage or Detective Marshall's two interviews with Stahl. He also did not speak with anyone other than Stahl. In addition, Dr. Ciula examined Stahl ten months after the incident at her home and did not question Stahl about the incident. It was within the province of the jury to give less weight to the expert testimony that relied upon evaluations of Stahl months after the incident than to the testimony of individuals actually present at the time of the offenses and videotaped interviews taken at the time of the offenses. Because the evidence is not without conflict and does not lead only to the conclusion that Stahl was insane when she committed the offenses, we conclude that the jury did not err when it rejected Stahl's insanity defense and found her to be guilty but mentally ill. *See Barcroft*, 111 N.E.3d at 1002.

## 2. Sufficiency of the Evidence

[26] Stahl next argues that there is insufficient evidence to support her convictions of Level 3 felony attempted aggravated battery and Level 5 felony battery. Our standard of review for sufficiency of the evidence claims is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or judge witness credibility. *Id.* We will affirm the conviction unless no reasonable fact finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict. *Id.* at 147.

[27] Regarding Stahl's Level 3 felony attempted aggravated battery conviction, INDIANA CODE § 35-42-2-1.5 provides that "[a] person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death" commits aggravated battery, a Level 3 felony. Further, "[a] person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime." I.C. § 35-41-5-1(a).

[28] Stahl appears to argue that there is insufficient evidence to support the substantial risk of death element of the attempted aggravated battery conviction. She specifically contends that "there is no evidence indicating the effect of putting water on A.A.'s face while the child's mouth was held open." (Stahl's Br. 9). However, expert medical testimony is not required to prove the substantial risk of death element of aggravated battery. *Oeth v. State*, 775 N.E.2d 696, 702 (Ind. Ct. App. 2002), *trans. denied*. Rather, "when determining

whether an element exists, the jury may rely on its collective common sense and knowledge acquired through everyday experiences." *Halsema v. State*, 823 N.E.2d 668, 673 (Ind. 2005) (citing 12 Robert Lowell Miller, Jr., *Indiana Evidence* § 201.101 (1995)).

[29]   Here, based on common sense and everyday living, the jury could have reasonably inferred that when Stahl held open her six-week-old son's mouth and placed his face under a faucet of running water, she engaged in conduct that constituted a substantial step toward knowingly or intentionally inflicting an injury on the infant that created a substantial risk of death. There is sufficient evidence to support Stahl's conviction for Level 3 felony attempted aggravated battery.

[30]   Regarding Stahl's Level 5 felony battery conviction, INDIANA CODE § 35-42-2-1 provides that "a person who knowingly or intentionally . . . touches another person in a rude, insolent, or angry manner . . . commits battery[.]" The statute further provides that the battery is a Level 5 felony if "[t]he offense is committed with a deadly weapon." I.C. § 35-42-2-1(g)(2). INDIANA CODE § 35-31.5-2-86(a)(2) defines "deadly weapon" as any "weapon, device, . . . or other material that in the manner it: (A) is used; (B) could ordinarily be used; or (C) is intended to be used; is readily capable of causing serious bodily injury." Serious bodily injury is defined as bodily injury that causes, among other things, extreme pain, serious permanent disfigurement, unconsciousness, or loss or impairment of a bodily member or organ. I.C. § 35-31.5-2-292.

[31]     Stahl argues that there is insufficient evidence that the knife she used to stab Blair in the neck was a deadly weapon. "[W]e have repeatedly stated that whether an object is a 'deadly weapon' on a given set of facts is determined from the nature of the object, the manner of its use, and the circumstances of the case." *Burgh v. State*, 79 N.E.3d 955, 957 (Ind. Ct. App. 2017). In addition, we have "instructed that whether an object is a 'deadly weapon' based on these factors is a question of fact." *Id.* (cleaned up). We further note that "[i]t is well-settled that a knife may be considered to be a deadly weapon." *Miller v. State*, 106 N.E.3d 1067, 1074 (Ind. Ct. App. 2018), *trans. denied*.

[32]     Moreover, the fact that a knife did not inflict serious bodily injury at the time of the offense is irrelevant so long as the knife is *readily capable* of causing serious bodily injury under the circumstances. *See* INDIANA CODE § 35-31.5-2-86(a)(2) (emphasis added). For example, in *Robinson v. State*, 543 N.E.2d 1119 (Ind. 1989), the defendant cut the victim with a utility knife, causing injury to her ear. In concluding that the knife was a deadly weapon, our Indiana Supreme Court reasoned that "had the same type of injury been delivered to the victim's throat, it could have been life-threatening." *Id.* at 1120.

[33]     Similarly here, Stahl, who was engaged in a physical struggle with Blair, picked up a knife and plunged its four-inch blade two to three inches into Blair's neck. The fact that Stahl's knife hit a fatty area of Blair's neck and happened to miss a crucial organ or blood vessel does not alter the life-threatening nature of the weapon. We further note that the jury heard testimony about the circumstances surrounding the stabbing, saw a photograph of the knife, and determined that it

was a deadly weapon. Stahl's argument is simply a request to reweigh the evidence, which we will not do. *See Drane*, 867 N.E.2d at 146. There is sufficient evidence to support Stahl's Level 5 felony battery with a deadly weapon conviction.

[34] Affirmed.

Vaidik, J., and Mathias, J., concur.