


FILED

Mar 06 2026, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Gregory C. Guilfoyle,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

March 6, 2026

Court of Appeals Case No.
25A-CR-1406

Appeal from the Franklin Circuit Court

The Honorable Brian D. Hill, Special Judge

Trial Court Cause No.
24C01-2405-F1-000269

---

**Opinion by Judge Felix**
Chief Judge Tavitas and Judge Vaidik concur.

**Felix, Judge.**

## Statement of the Case

During a severe snowstorm with below-zero wind chills, Gregory Guilfoyle shot his wife Hannah Guilfoyle, dragged her outside their home, and left her for dead. Guilfoyle then left on foot, carrying his and Hannah's young child. When Franklin County Sheriff's Deputy Arin Bowers encountered them in the middle of a snowy road and tried to help, Guilfoyle shot Deputy Bowers. Both Hannah and Deputy Bowers survived. Four mental health experts examined Guilfoyle to determine his sanity; only the State's expert found him to be sane at the time he committed the offenses. A jury found Guilfoyle guilty but mentally ill of eight offenses, and he was sentenced to a near-maximum sentence of 100 years in prison. Guilfoyle now appeals and raises two issues for our review:

1. Whether Guilfoyle presented sufficient evidence to prove he was not guilty by reason of insanity; and
2. Whether Guilfoyle's sentence is inappropriate under Indiana Appellate Rule 7(B).

We affirm and remand with instructions.

## Facts and Procedural History

### Background

We start our review with events prior to the offenses because those events are relevant to both Guilfoyle's appellate claims. Guilfoyle and Hannah met in

2019 and had their first child together, R.G. ("Child"), in January 2021. In 2022, Guilfoyle, Hannah, and Child lived together in Franklin County, Indiana.

[4] On August 15, 2022, Guilfoyle went to a local emergency room for alcohol withdrawal symptoms. Guilfoyle reported to the staff that he "has a longstanding history with alcohol abuse," "this is the 1st time that he has actually [sought] help," he "believes" he has "posttraumatic stress disorder from when he was a police officer," and he quit being an officer in 2016. Tr. Vol. XI at 82. Guilfoyle denied "any history of hallucinations visual or auditory," but he did report feeling "very anxious" and "very jittery." *Id.* Staff provided Guilfoyle with "resources for outpatient follow-up," *id.* at 83, and a prescription for Zoloft.

[5] On October 2, Guilfoyle came home from his bachelor party drunk, prompting Hannah to call his parents for help. When they arrived, they observed holes in the walls. Guilfoyle was angry and throwing things, and he hit his mother in the face with a kitchen drawer—"Her face [was] busted up pretty good," State's Ex. 30 at 00:30–00:32.[1] Guilfoyle's father ended up taking away Guilfoyle's gun because he "was concerned" Guilfoyle would "hurt[] himself." Tr. Vol. VIII at 5. On October 8, 2022, Hannah and Guilfoyle married. In late

___

[1] In connection with this incident, under Cause 24C02-2210-CM-000728, Guilfoyle was charged with domestic battery as a Class A misdemeanor. The charge was later amended to criminal recklessness as a Class B misdemeanor before being dismissed.

November or early December, Guilfoyle's father returned the gun to Guilfoyle, believing Guilfoyle "seemed pretty down to earth," "things . . . seemed to have settled out," and Guilfoyle needed a weapon to protect his family. *Id.* at 6.

On November 27, Hannah and Guilfoyle officially formed their jointly owned company Gilco Construction, LLC. In December, Hannah and Guilfoyle were fighting "a lot . . . about money, about sex, about everything. Just day-to-day arguments, anything to fight about." Tr. Vol. VI at 167. In early December, Guilfoyle and Hannah attended a business event in Ohio. While there, Hannah "held [Guilfoyle's] hand, and he didn't like that." *Id.* at 170. When the event "broke for lunch" and the couple returned to their car, Guilfoyle "started belittling [Hannah], screaming at [her], cussing, hitting the center console, in [her] face, screaming at [her], arguing with [her]. . . . He was just very upset and very belligerent." *Id.* Also in December, Hannah learned and told Guilfoyle that she was pregnant with their second child. Hannah "was probably only a couple weeks" along, and Guilfoyle "was very excited and happy about" the pregnancy. *Id.* at 171.

### The Shootings & Immediate Aftermath

On the morning of December 22, Guilfoyle told Hannah "that he was going to get his hair cut and that he was going to do a bid down the street" for the construction company. Tr. Vol. VI at 171. That evening, it was snowing heavily—approximately one inch every "40 minutes to an hour"—and "with the wind chill, it was probably close" to -10 degrees. *Id*. at 69. Guilfoyle, Hannah, and Child were all in their home. Child "was sleeping in her crib,"

and Hannah and Guilfoyle were sitting on the couch. *Id.* at 172. Hannah "was about to get up and make [Guilfoyle's] birthday cake" when Guilfoyle got up from the couch. *Id.* Hannah thought Guilfoyle "was going to the bathroom," but then he remotely started his truck and "walked down the hallway with [Child] in his arms." *Id.* "[T]hat's when [Guilfoyle] started belittling [Hannah], arguing with [her], cussing at [her]." *Id.* Guilfoyle told Hannah that she "was a bad mom and he was going to kill" Child. *Id.* The last thing Hannah remembers "is the door being open and that's it." *Id.*

[8] According to Guilfoyle, he shot Hannah "point-blank to the head" while "she was standing up," State's Ex. 26 at 08:58–09:04, inside the house. Guilfoyle then "dragged [Hannah] outside," *id.* at 09:26–09:28; retrieved Child from her crib; locked the front door; and walked right by Hannah with Child in his arms. Guilfoyle knew that Hannah "would not survive" the gunshot wound to her head. *Id.* at 02:04–2:10. Guilfoyle tried to leave in his truck, but it "shut down," *id.* at 05:35–05:36, so he started walking to his father's house.

[9] At approximately 12:00 a.m. on December 23, Indiana Department of Transportation employee Timothy Henry was plowing snow near the intersection of U.S. 52 and State Road 1 when he saw "a man . . . in the middle of the road." Tr. Vol. VI at 69. Once the man was in Henry's headlights, Henry noticed that he was not dressed in winter clothes and had "a baby in [his] left arm," who was also not dressed for the weather. *Id.* at 70. Henry caused law enforcement to be notified.

Deputy Bowers responded in a marked police vehicle to the location where Henry had been. Deputy Bowers located the man walking in the middle of State Road 1 and recognized him as Guilfoyle. Deputy Bowers got out of his vehicle and asked Guilfoyle what was going on; Guilfoyle "just began asking if [Deputy Bowers] would give him a ride to his dad's," Tr. Vol. VI at 77. Deputy Bowers "told [Guilfoyle that he would] be happy to give him a ride . . . once [he] figured out what was going on." *Id.* Deputy Bowers then opened the rear passenger door of his vehicle and asked Guilfoyle to put Child in the back seat to "get warm." *Id.* Guilfoyle refused and "began to walk away." *Id.* Deputy Bowers followed him. Just a few seconds later, Guilfoyle turned around, drew a gun with his right hand—he was still carrying Child with his left hand—and pointed the gun directly at Deputy Bowers. Immediately, Deputy Bowers drew his own weapon and shot at Guilfoyle, and a shootout ensued.

When the two were "between 15 and 25 feet" away from one another, Tr. Vol. VI at 81, Guilfoyle shot Deputy Bowers in his bulletproof vest, "basically center mass on [his] chest, just on [his] left pectoral," *id.* at 80. While shooting at Deputy Bowers, Guilfoyle fell to the ground, losing his grip on both the gun and Child. Concerned that Guilfoyle "was going to grab the gun and pull [Child] back into the mix," *id.* at 81, Deputy Bowers shot at Guilfoyle again, causing Guilfoyle to fall on his back. Deputy Bowers ordered Guilfoyle to

"drop the gun," State's Ex. 1-1 at 08:43–08:45,[2] and Guilfoyle put his hands up. Deputy Bowers immediately grabbed Child and ensured she was physically unharmed. While Deputy Bowers was checking on Child, other law enforcement officers began arriving on scene. From the time Deputy Bowers found Guilfoyle in the middle of the road to the time he secured Child, less than two minutes elapsed.

[12]    After securing Guilfoyle in handcuffs, Deputy Bowers and other officers rendered aid to Guilfoyle, whom Deputy Bowers had shot in the torso and groin. The officers did not discover the wound to Guilfoyle's groin until several minutes after it occurred, and he was "bleeding profus[]ely" from that injury, Tr. Vol. VI at 117. The officers were able to slow but not stop the bleeding.

[13]    While the officers were rendering aid to Guilfoyle, he was initially cursing at them. Approximately nine minutes after the shooting and after the officers had begun to slow the bleeding from Guilfoyle's groin wound, Guilfoyle said, "Forgive him father. Forgive him." State's Ex. 6 at 08:39–8:42. Thinking Guilfoyle was talking to him, Deputy Bowers responded, "I forgive you . . . ." *Id.* at 08:52–08:54. Guilfoyle told Deputy Bowers, "I don't give a f[*]ck if you forgive me." *Id.* at 08:54–08:56. Shortly thereafter, Guilfoyle said, "You will all burn for eternity. You will burn for eternity while I f[*]ck all your wives,

---

[2] State's Ex. 1 contains two separate video files: (1) one video file from Deputy Bowers's dashboard camera that was pointed toward the front of his vehicle and (2) one video file from Deputy Bowers's interior car camera that was pointed toward the back seat of his vehicle. For ease of reference, we cite to the first video as "State's Ex. 1-1," and we cite to the second video as "State's Ex. 1-2."

you little bitches." State's Ex. 6 at 10:24–10:37. One of the officers told Guilfoyle, "This ain't you." *Id.* at 10:41–10:43. Guilfoyle responded, "Wait 'til God gets here." *Id.* at 10:43–10:45. After mentioning something about his father and a cartel, Guilfoyle told the officers, "I know where all you guys live. I'm CIA," *id.* at 11:07–11:10. Approximately 13 minutes after the shooting, Guilfoyle instructed the officers, "Get my daughter home and take me to jail." State's Ex. 1-1 at 21:45–21:47; State's Ex. 1-2 at 21:40–21:42. Guilfoyle also told officers that his "dad is in the f[*]cking mob, motherf[*]ckers." State's Ex. 6 at 15:39–15:42.

[14] An ambulance arrived to transport Guilfoyle to the hospital, and while in route, Guilfoyle attempted to choke an EMT. The EMT believed Guilfoyle "was in hypovolemic shock due to more than likely blood loss." Tr. Vol. VI at 233. An hour after arriving at a local emergency room and while still undergoing treatment, Guilfoyle asked for his lawyer. When no one responded to him, Guilfoyle stated, "You all are going to burn in f[*]cking hell." State's Ex. 27 at 1:02:52–1:02:58. A nurse asked him why, and Guilfoyle responded, "Because you're not helping." *Id.* at 1:02:59–1:03:01. Guilfoyle then told the people in the room, "For eternity, you'll burn in hell." *Id.* at 1:03:28–1:03:30. For several minutes thereafter, Guilfoyle continued periodically making threats and biblical references. A while later, Guilfoyle stated, "I just shot my wife in the f[*]cking head." *Id.* at 1:14:39–1:14:44.

[15] Meanwhile, Child was taken to the Franklin County Security Center; an Indiana Department of Child Services ("DCS") employee picked her up from

there and transported her to the hospital because Child was still "shaking and shivering" and she had "a huge red spot" on one of her legs, Tr. Vol. VI at 124. Throughout all these events, Child was dressed in only a long sleeve pajama top and pajama pants; she did not have on socks, shoes, a coat, a hat, or any other weather-appropriate clothing. When Child was evaluated at a local hospital— approximately 2 hours after law enforcement first contacted DCS—her body temperature was 93 degrees. The red spot on Child's leg was determined to be "early onset . . . frostbite." *Id.* at 126. Child did not sustain any lasting physical injuries from the incident.

[16] While Guilfoyle was taken to the hospital and Child was taken to the Security Center, Franklin County Sheriff's Sergeant Kyle Hartman and Deputy Tyler Ford went to do a welfare check on Hannah. As they approached Hannah and Guilfoyle's house, Sergeant Hartman and Deputy Ford noticed a pickup truck parked but running in the backyard and a person—Hannah—lying in the front yard. Hannah "was kind of just like a bloody icicle. Everything appeared to be frozen. Her eyes could follow [Sergeant Hartman]. She couldn't really talk. . . . Her hair was all matted and bloody." Tr. Vol. VI at 143–44. Hannah was wearing "night clothes" that "had been kind of pulled up. Her feet, legs, her back, midsection, and neck, shoulder area were exposed to the elements. [S]he had frostbite starting to form on her feet. [T]here was blood splatter or a blood pooling near the back of her head." *Id.* at 197. Hannah had a bullet entry wound behind her right ear and an exit wound toward the back of her head.

[17]    Hannah survived, but she lost her pregnancy and a fallopian tube, she lost the tips of five of her toes from frostbite, she has a bald spot on the back of her head from frostbite, she has a permanent shunt in her head, she aspirates when she eats and drinks, the right side of her body is weak, she has nerve damage in her right hand, and she has diminished use of her right eye. Hannah did not return home until May 2023.

[18]    Guilfoyle was paralyzed from the chest down as a result of his injuries. While in the hospital, Guilfoyle was also treated for psychosis. One of Guilfoyle's doctors noted that it was "[u]nusual" for a 31-year-old man to suddenly develop a psychotic disorder "without" an "obvious substance use disorder." Tr. Vol. XI at 197; *see also* Tr. Vol. VII at 163. The same doctor noted that Guilfoyle's family reported he "may have had some [symptoms] since October," but this "chronology of persistent manic and psychotic symptoms worsening over 3 months would be unusual for a primary bipolar mania episode." Tr. Vol. XI at 197. By the time he was discharged in mid-January 2023, doctors were not able to definitively diagnose Guilfoyle, but they believed he had "[m]ania with psychotic features," which they thought might have been complicated by his history of PTSD. Tr. Vol. XI at 223.

[19]    When interviewed by the Indiana State Police, Deputy Bowers stated that Guilfoyle "was off his baseline from what [he] had seen [from] him in the past." Tr. Vol. VI at 104. Within the first few days of being hospitalized, Guilfoyle told his pastor and his pastor's wife that he shot Hannah but "it wasn't Hannah . . . . The face kind of looked like her, but it wasn't because she had black

wings.  And before I shot, I looked down at [Child] and she smiled at me and I knew that it was okay."  Tr. Vol. VIII at 50.

[20]  On December 27, Guilfoyle was interviewed by the Indiana State Police. When asked about the incident, Guilfoyle stated, "Well, I had mental break.  I saw a demon in my wife.  Saint Michael was my protector that day."  State's Ex. 26 at 01:16–01:34.  Guilfoyle claimed that Hannah "wouldn't let me leave, so I shot her."  State's Ex. 26 at 01:56–01:59.  Guilfoyle also asserted that he was trying to put their cell phones outside and Hannah would not let him:

> She wouldn't -- she wouldn't put them outside.  I kept trying to tell her to put them outside, and she would not let go of them. And I -- I said, "Well, we'll put them in the garage, in my truck." And she would not do that.  She wouldn't -- and I tried to take it from her gently and she would not do that, she just stood in front of the door.  I said, "You're giving me no choice."  And then -- and she was -- I don't know how I survived.  It's so crazy man.

*Id.* at 06:55–07:17.  Guilfoyle explained that he "felt like, um, people could enter my house or see what's going on in my house with those like, um, Garden of Eden type stuff and -- . . . you know, I grew up back the Old Testament when -- when Adam didn't refuse his wife, that's when God punished him, and I thought that's what he was testing me on."  *Id.* at 07:22–07:51.  Guilfoyle later elaborated that he

> thought people were trying to have sex with me in the house, and I thought it was a blackmail tactic or power tactic and . . . I kept asking her.  I wanted to try to talk to her about it.  . . .  [S]he got really defensive.  I said, "Man, I just can't in the house."

*Id.* at 10:07–10:36.

When describing his encounter with Deputy Bowers, Guilfoyle stated,

> I had CIA intelligence that there was people . . . taking kids in the area, and based on my Fourth Amendment rights, I knew that the -- the officer I spoke to did not know what was going on at the time, came up. I felt -- like I tried to walk away. I said, "No" -- he said, "You need help?" I said, "No." And, um, he was trying to get me to go in the car. . . . I just pulled out my gun. "I'm not getting in the car. You're not taking my baby from me." And then I got shot . . . . I didn't want to hurt the man, I just didn't want -- I didn't want anybody to take my -- hurt my family on my watch.

State's Ex. 26 at 02:33–03:41. Guilfoyle also told the officers that he has "PTSD really bad," "was a severe alcoholic," and "quit drinking after [his] bachelor party." *Id.* at 12:32–12:39.

## Charges, Trial, & Sentencing

The State charged Guilfoyle with eight offenses: two counts of attempted murder as Level 1 felonies, one count of aggravated battery as a Level 3 felony, one count of domestic battery as a Level 5 felony, one count of battery with a deadly weapon as a Level 5 felony, one count of pointing a firearm as a Level 6 felony, and two counts of neglect of a dependent as Level 6 felonies. The State also alleged Guilfoyle used a firearm in committing both attempted murders and one of the neglect offenses.

[23]    Guilfoyle asserted an insanity defense. At trial, four mental health experts testified. The two court-appointed experts opined that Guilfoyle was unable to appreciate the wrongfulness of his conduct when he committed his offenses. Guilfoyle's expert agreed. However, the State's expert opined that Guilfoyle was able to appreciate the wrongfulness of his conduct at the time of his offenses. Next, we review each expert's opinion in more detail.

[24]    Doctor Don Olive, one of the court-appointed experts, concluded that at the time of the offenses, Guilfoyle "was suffering from . . . Bipolar I disorder, with features of mania and psychosis."[3] Tr. Vol. IX at 84. Doctor Olive opined that "based upon his mental disease, Mr. Guilfoyle was unable to appreciate the wrongfulness of his conduct at the time in question." *Id.* at 85. Doctor Olive "did not suspect malingering"[4] when he interviewed Guilfoyle, so he did not test for it. *Id.* at 99. Further, Doctor Olive testified that Guilfoyle has had "problems in the past with controlling his anger," is "a very insecure person," and has engaged in "some self-destructive behavior" such as "alcohol abuse and the like." *Id.* at 117. Doctor Olive also stated that if Guilfoyle was acting normally as others described him, that "could cast doubt on what exactly he was experiencing or not experiencing that day," *id.* at 106, and agreed that

---

[3] Doctor Olive also diagnosed Guilfoyle with PTSD based on Guilfoyle's self-reported experiences as a law enforcement officer, but Doctor Olive did not believe there was a link between Guilfoyle's PTSD and his offenses.

[4] "Malingering" is a term "use[d] to describe a person that is maybe embellishing or exaggerating psychiatric symptoms for secondary gain." Tr. Vol. IX at 7. For instance, in a criminal case, a defendant may "embellish symptoms or even sometimes make up symptoms in order to get a lighter sentence." *Id.*

believing Hannah's version of events would cast doubt on his analysis of Guilfoyle's mental state.

[25]   Doctor George Parker, the other court-appointed expert, opined in his first report that Guilfoyle met the criteria for insanity when he shot Hannah but regained his sanity before shooting Deputy Bowers. According to Doctor Parker, this opinion was "based on incomplete data." Tr. Vol. IX at 159. After receiving more information—such as videos, more complete post-shooting hospital records, and a second interview with Guilfoyle—Doctor Parker diagnosed Guilfoyle with "bipolar disorder type 1," Tr. Vol. IX at 139, and concluded that "at the time of the alleged offenses, [Guilfoyle] was in a manic and psychotic episode," *id.* at 140. In his second report and at trial, Doctor Parker opined that Guilfoyle "did not appreciate the wrong[fulness] of his actions at the time of the alleged offenses due to his mental disease." *Id.* As for the statements Guilfoyle made after shooting Deputy Bowers, Doctor Parker testified that Guilfoyle was in a state of shock and was "deeper in shock" when he arrived at the first hospital—"the trauma of the shooting and the blood loss and then the recovery, that's going to contribute to his mental state." *Id.* at 152. Nonetheless, Doctor Parker believed there was "pretty clear evidence" that Guilfoyle was "psychotic throughout this whole episode, before, during, and after." *Id.* Doctor Parker "did not do a formal test of malingering, but [he] saw no evidence that Mr. Guilfoyle was malingering his symptoms in either of the interviews." *Id.* at 150.

[26] Guilfoyle's expert, Doctor Marc Martinez, concluded that at the time of the offenses, Guilfoyle was suffering from Bipolar I disorder with psychotic features, post-traumatic stress disorder, and alcohol use disorder in early remission. Doctor Martinez ruled out hypovolemic shock and Guilfoyle's marijuana use as causes of his behavior. According to Doctor Martinez, "Even assuming [Guilfoyle had] fleeting moments of . . . appreciation of the illegality of his actions, there is contrary evidence that he was operating under a moral imperative to protect his family based on delusional beliefs." Tr. Vol. VIII at 138. Doctor Martinez opined that Guilfoyle "had prominent psychotic symptoms" at the time he committed his offenses, *id.* at 95, and was not able to appreciate the wrongfulness of his conduct.

[27] The State's expert, Doctor Edward Connor, testified that anything Guilfoyle said "after the time he was shot" carried little weight "because that could be a reaction to a near death experience." Tr. Vol. IX at 23. Doctor Connor administered a malingering test to Guilfoyle, and Guilfoyle scored 14 points—the cut off for determining whether a person is malingering. Doctor Connor concluded that Guilfoyle exhibited "some indications of malingering," which made Doctor Connor "suspicious that perhaps [Guilfoyle] was exaggerating." *Id.* at 19. According to Doctor Connor, Guilfoyle's hallucinations were "atypical" because most people "see images of a person" and not "distorted figures." *Id.* Similarly, "a visual hallucination [is typically] not within reach," yet Hannah was within Guilfoyle's reach, as demonstrated by his statement that he shot her at point blank range. *Id.*

[28] Doctor Connor opined that Guilfoyle was suffering from "some level of mental illness" when committing his offenses, Tr. Vol. IX at 38, but he was not suffering from "a severe psychosis," *id.* at 39, and was "able to make rational decisions and distinguish between right and wrong at the time of the offense," *id.* at 15. Doctor Connor originally reached this conclusion but briefly changed it to align with the three other experts after receiving more information, namely, more medical records, deposition transcripts, and text messages. However, after interviewing Hannah, Doctor Connor reverted to his original conclusion—Guilfoyle was not insane at the time of the offenses.

[29] In addition to expert testimony regarding Guilfoyle's sanity, the jury also heard from lay witnesses who described Guilfoyle's behavior in the days and weeks prior to the offenses. Amy Stringer, the wife of Guilfoyle's pastor, testified that at a bible study in December, Guilfoyle stepped out to take a phone call, and when he came back in the room, he stated, "I think I got this deal and I'm going to buy all this farm for everybody and I'm going to donate money to church and I got a $4 million deal." Tr. Vol. VIII at 44. Stringer said she "had never seen [Guilfoyle] act like that or talk like that"—he was "talking like really fast and saying all this bizarre stuff about paying everybody all this money and buying all this farm land." *Id.* Conversely, one of Guilfoyle's neighbors testified that he met with Guilfoyle on December 17, 2022, regarding "some excavation work," Tr. Vol. VIII at 164, and Guilfoyle "was professional, kind, considerate, [and] listened well," *id.* at 165. Similarly, one of Guilfoyle's employees was with him in the days leading up to the shootings and nothing

appeared out of the ordinary, although Guilfoyle "seemed kind of like half deflated" and "tired," *id.* at 173.

[30] Several witnesses testified that Guilfoyle recounted various events he experienced while working as a law enforcement officer for the Greenhills Police Department ("GPD") in Ohio, which he claimed caused him to suffer from PTSD. Witnesses from GPD and other relevant police departments minimized the extent of Guilfoyle's involvement in one of these events and alleged that the other events did not happen at all. There was also evidence that Guilfoyle studied psychology and criminal justice in college.

[31] The jury found Guilfoyle guilty but mentally ill ("GBMI") on all counts as charged. Guilfoyle admitted to using a firearm in his attempted murder of Hannah, and the other two firearm enhancements were dismissed. On double jeopardy concerns, the trial court vacated Guilfoyle's convictions for all three battery counts and the pointing a firearm count—leaving only the two attempted murder convictions, the two neglect convictions, and the firearm enhancement. The trial court sentenced Guilfoyle to a total of 100 years of incarceration. This appeal ensued.[5]

---

[5] On February 5, 2026, we held oral argument in this case at Indiana State University in Terre Haute, Indiana. We thank all those in attendance for their attentiveness and hospitality, and we thank counsel for both parties for the quality of their advocacy.

## Discussion and Decision

### 1. The Jury Did Not Err by Rejecting Guilfoyle's Insanity Defense

[32] Because Guilfoyle raised an insanity defense, the jury had four options for its verdict: (1) guilty, (2) not guilty, (3) "not responsible by reason of insanity at the time of the crime," or (4) "guilty but mentally ill at the time of the crime." Ind. Code § 35-36-2-3. The jury found Guilfoyle was guilty but mentally ill, thereby rejecting his insanity defense. On appeal, Guilfoyle claims he presented sufficient evidence to support his insanity defense such that the jury should have found him not guilty by reason of insanity ("NGRI").[6]

[33] We will affirm a jury's verdict that rejected the insanity defense "unless 'the evidence is *without conflict* and leads *only* to the conclusion that the defendant was insane when the crime was committed.'" *Payne v. State*, 144 N.E.3d 706, 709 (Ind. 2020) (emphases added) (quoting *Barcroft v. State*, 111 N.E.3d 997, 1002 (Ind. 2018)). We "consider only the evidence most favorable to" the verdict, and we neither reweigh the evidence nor reassess witness credibility. *Id.* at 709–10 (quoting *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004)). We give "substantial deference" to "the factfinder's determination that a defendant was not insane at the time of the offense." *Id.* at 710 (internal quotation marks omitted) (quoting *Barcroft*, 111 N.E.3d at 1002). Nevertheless,

---

[6] Guilfoyle does not challenge the sufficiency of the evidence supporting his convictions. Appellant's Br. at 16.

"the inferences drawn by the factfinder from the evidence at trial must be 'reasonable and logical.'" *Id.* (quoting *Thompson*, 804 N.E.2d at 1149).

[34] An alternative to an insanity finding is a finding that the defendant is GBMI. A jury may conclude a defendant is GBMI if it finds that he committed the charged offense while "having a psychiatric disorder which substantially disturbs [his] thinking, feeling, or behavior and impairs [his] ability to function." I.C. § 35-36-1-1. A jury may conclude defendant is NGRI if it finds that "as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense."[7] *Id.* § 35-41-3-6(a). The defendant bears the burden of proving mental illness and the inability to appreciate the wrongfulness of his actions by a preponderance of the evidence. *Satterfield v. State*, 33 N.E.3d 344, 348 (Ind. 2015) (citing I.C. § 35-41-4-1(b); *Galloway v. State*, 938 N.E.2d 699, 709 (Ind. 2010)).

[35] The parties do not dispute that Guilfoyle proved he had a mental illness, mental disease, or mental defect. Rather, their dispute centers on whether Guilfoyle was unable to appreciate the wrongfulness of his conduct when he committed the offenses.

[36] A jury "may consider all relevant evidence in reaching a verdict," including lay opinion testimony and the circumstances of the crime, *Satterfield*, 33 N.E.3d at

---

[7] As used in the insanity statute, "'mental disease or defect' means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct." I.C. § 35-41-3-6(b).

348, as well as "testimony from expert witnesses, proof of the defendant's demeanor at the time of the offense, and the defendant's history of mental illness," *Payne*, 144 N.E.3d at 710 (citing *Barcroft*, 111 N.E.3d at 1002–03, 1008). "Expert opinion is 'purely advisory' and a factfinder may discredit [an expert's] testimony, or disregard it completely, in lieu of other probative evidence." *Id.* (citing *Barcroft*, 111 N.E.3d at 1003). This is true even when the expert testimony is unanimous. *Satterfield*, 33 N.E.3d at 348–49.

[37] Guilfoyle argues that Doctors Olive, Parker, and Martinez presented unanimous opinions that Guilfoyle did not appreciate the wrongfulness of his conduct when he committed his offense, and Doctor Connor's contrary opinion "did not create a genuine factual dispute," Appellant's Br. at 19.[8] In support, Guilfoyle points to lay testimony regarding his August 2022 ER visit, during which he claims he "was diagnosed with PTSD, anxiety, and substance use disorder," Appellant's Br. at 19–20 (citing Tr. Vol. XI at 82); his father's decision to take away his gun; Stringer's description of him "acting 'manic' by talking quickly and saying 'bizarre stuff'" at church a "few weeks before the shootings," *id.* at 20 (quoting Tr. Vol. VIII at 44); the numerous "delusional statements" he made after being shot, *id.*; his description of the events during

---

[8] Guilfoyle asserts that before trial, Doctor Connor "agreed with the three other experts," Appellant's Br. at 19 (citing Tr. Vol. IX at 64), but once Doctor Connor "receiv[ed] Guilfoyle's medical records and interview[ed] Hannah, he believed Guilfoyle may have been malingering," *id.* (citing Tr. Vol. IX at 11–13). The record does not support this characterization. According to Doctor Connor's testimony, he originally concluded that Guilfoyle was not insane, briefly believed Guilfoyle was insane after reviewing more of Guilfoyle's medical records, and then reverted to his original conclusion after interviewing Hannah.

his interview with the Indiana State Police; and his exhibition of "delusional behavior, psychotic features, and symptoms of hallucinations" that continued "[f]or days after the shootings," *id.* at 21 (citing Tr. Vol. VII at 146, 151–52, 163–64).

[38] Guilfoyle's argument is a request to reweigh the evidence and reassess witness credibility, which we cannot do. *See Payne*, 144 N.E.3d at 709–10 (quoting *Thompson*, 804 N.E.2d at 1149). As the State points out, Doctor Connor's opinion—although contrary to the other three experts' opinions—"was sufficiently probative of sanity to sustain the jury's verdict," Appellee's Br. at 16, and it was for the jury to decide which expert or experts to believe. Additional lay witness testimony established that Guilfoyle seemed normal in the days leading up to the offenses, and Guilfoyle's own statements after the shootings showed he appreciated the wrongfulness of his conduct, such as his admissions to shooting Hannah and his requests to be taken to jail.

[39] The evidence here is not without conflict such that it leads to only the conclusion that Guilfoyle was insane when he committed his offenses. The jury, faced with conflicting evidence, decided that Guilfoyle appreciated the wrongfulness of his conduct when he committed his offenses. On this record, we will not disturb that decision.

## 2. Guilfoyle's Sentence Is Inappropriate under Appellate Rule 7(B)

[40] Guilfoyle argues his sentence is inappropriate under Appellate Rule 7(B) and should be revised. The Indiana Constitution authorizes us to independently

review and revise a trial court's sentencing decision. *Russell v. State*, 234 N.E.3d 829, 855–56 (Ind. 2024) (citing Ind. Const. art. 7, §§ 4, 6; *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020)). That authority is implemented through Appellate Rule 7(B), which permits us to revise a sentence if, "after due consideration of the trial court's decision, [we] find[] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Konkle v. State*, 253 N.E.3d 1068, 1092 (Ind. 2025) (quoting *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020)).

[41] Our Supreme Court has explained our role under Appellate Rule 7(B) as follows:

> "[O]ur constitutional authority to review and revise sentences boils down to our collective sense of what is appropriate," *Cramer* [*v. State*], 240 N.E.3d [693,] 698 [(Ind. 2024)] (quoting *Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017)), an act that, importantly, is reserved for "exceptional" cases, *id.* (citing *Gibson v. State*, 43 N.E.3d 231, 241 (Ind. 2015)). Determining a sentence's appropriateness thus "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *McCain*, 148 N.E.3d at 985.

*Konkle*, 253 N.E.3d at 1092.

[42] In reviewing the defendant's sentence, "we are not limited to the mitigators and aggravators found by the trial court," *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014), and we "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any

individual count," *Lane*, 232 N.E.3d at 122 (quoting *Cardwell*, 895 N.E.2d at 1225). A trial judge may impose any sentence within the statutory range without regard to the existence of aggravating or mitigating factors. *Anglemyer v. State*, 868 N.E.2d 482, 489 (Ind. 2007), as amended (July 10, 2007), decision clarified on reh'g, 875 N.E.2d 218 (Ind. 2007). However, maximum sentences are generally reserved for "the worst of the worst" offenders. *Schuler v. State*, 112 N.E.3d 180, 190 (Ind. 2018) (quoting *Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011)). When considering the nature of the offense, we start with the advisory sentence. *Brown*, 10 N.E.3d at 4 (citing Anglemyer, 868 N.E.2d at 494).

[43] Here, Guilfoyle was convicted of and sentenced on two Level 1 felonies and two Level 6 felonies; Guilfoyle's sentence was also enhanced for his use of a firearm. "[A] person who commits a Level 1 felony . . . shall be imprisoned for a fixed term of between twenty (20) and forty (40) years, with *the advisory sentence being thirty (30) years*." I.C. § 35-50-2-4(b) (emphasis added). On each of his two Level 1 felony convictions, the trial court sentenced Guilfoyle to 38 years executed at the Indiana Department of Correction ("DOC"). "A person who commits a Level 6 felony . . . shall be imprisoned for a fixed term of between six (6) months and two and one-half (2 ½) years, with *the advisory sentence being one (1) year*." *Id.* § 35-50-2-7(b) (emphasis added). On each of his two Level 6 felony convictions, the trial court sentenced Guilfoyle to 2 years executed at the DOC. Because Guilfoyle admitted to using a firearm in his attempted murder of Hannah, his sentence for that conviction was to be

enhanced by an additional fixed term between 5 and 20 years. *See id.* § 35-50-2-11(g). The trial court enhanced that sentence by 20 years, resulting in a 58-year sentence. The trial court ordered Guilfoyle to serve all four sentences consecutively, for a total of 100 years executed at the DOC. This total sentence is only five years less than the maximum sentence the trial court could have imposed.

[44] As to the nature of the offenses, Guilfoyle shot Hannah in the back of the head at point blank range in their family home before dragging her outside into freezing winter weather and leaving her to die. Although the record is unclear concerning where Child was when all this occurred, at the very least, Guilfoyle carried Child right past Hannah as he left the house. Guilfoyle then walked with Child, who was clad in only thin pajamas, to his father's home. When Deputy Bowers tried to help them, Guilfoyle—with Child still in his arms—shot Deputy Bowers, too. Importantly, the jury determined that Guilfoyle committed these offenses while "having a psychiatric disorder which substantially disturb[ed his] thinking, feeling, or behavior and impair[ed his] ability to function." I.C. § 35-36-1-1.

[45] Hannah suffered numerous life-altering injuries, Child suffered from early onsite frostbite on her leg, and Deputy Bowers was not permanently physically harmed because the bullet struck his bulletproof vest. At the sentencing hearing, Hannah's mother testified that Hannah had lost her "vibrancy" and that she fears Hannah may never be happy again. Tr. Vol. X at 110. Hannah's mother also testified that after the shootings, Child "would scream and cry out

at night, crying out for her mama." *Id.* at 109. Deputy Bowers's wife testified that Guilfoyle's actions "turned a proud, strong father and husband into a man haunted by a moment he didn't deserve." *Id.* at 104. Deputy Bowers "now struggles when [his] baby girl cries, because the sound of those cries brings him back to [Child]'s." *Id.*

[46] In considering the character of the offender, "we engage in a broad consideration of a defendant's qualities," *T.A.D.W.*, 51 N.E.3d at 1211 (citing *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*), including whether the defendant has "substantial virtuous traits or persistent examples of good character," *Konkle*, 253 N.E.3d at 1093 (quoting *Stephenson*, 29 N.E.3d at 122).

[47] Guilfoyle's presentence investigation report ("PSI") shows that this is his first conviction. Regarding his time as a law enforcement officer, the PSI states:

> The defendant also worked as an "auxiliary" (non-paid) police officer in Madeira, Ohio then was hired on to Greenhills, Ohio Police Department around 2014. He worked for Greenhills part time for about 2 years then was hired as full time.

Appellant's App. Vol. VII at 169. Because of departmental policy violations, Guilfoyle did not retain his position for long. Guilfoyle reported that "after losing his job as a police officer he started to drink almost daily. At one point he was drinking half a bottle of Maker's Mark whiskey a day." *Id.* at 170.

[48] Upon leaving law enforcement, Guilfoyle "completed four years of apprenticeships with the International Union of Operating Engineers, Local 18 . . . and obtained an Associate's Degree in Construction." Appellant's App. Vol. VII at 168. Approximately a year before the offenses occurred, Guilfoyle and his parents started a trucking and excavation company. And less than one month before the offenses occurred, Guilfoyle and Hannah started their construction company.

[49] As a result of the shootout he initiated with Deputy Bowers, Guilfoyle is now paralyzed from the chest down and requires intensive care. Regarding his mental condition, the testimony at trial also showed that Guilfoyle was diagnosed with PTSD and Bipolar I disorder. During the offense, at a minimum, his actions were marked by mental illness. Guilfoyle's mental condition is a significant factor in our consideration of his character. Guilfoyle's therapist testified that she had been working with him since April of 2023 and that he had made "radical" progress with his mental health, Tr. Vol. X at 123. Guilfoyle's therapist also confirmed that her initial treatment of Guilfoyle included teaching him about his mental health diagnoses, and she knew this was occurring before the court-appointed experts evaluated him.

[50] A key component of this case is the jury's finding that Guilfoyle was guilty *but mentally ill*. Although a person who is found guilty but mentally ill "'is not *automatically* entitled to any particular credit or deduction from his otherwise aggravated sentence' simply by virtue of being mentally ill," *Weeks v. State*, 697 N.E.2d 28, 30 (Ind. 1998) (emphasis added) (quoting *Archer v. State*, 689 N.E.2d

678, 684 (Ind. 1997)), the facts of this case demonstrate that Guilfoyle's mental illness must be considered in our Appellate Rule 7(B) review, *see, e.g.*, *Lopez v. State*, 869 N.E.2d 1254, 1260–61 (Ind. Ct. App. 2007) (collecting cases in which appellate court reduced sentences based in part on mental illness evidence).

[51] In light of the jury's finding, Guilfoyle's lack of criminal history, years of offering volunteered police work, steady employment history, and current and future lack of physical independence, we believe his near-maximum 100-year sentence is inappropriate. This is not a case where the defendant was found guilty and there was some evidence in the record tending to show he had a mental illness. Guilfoyle's mental illness was found to have substantially disturbed his thinking, feeling, or behavior or impaired his ability to function when he committed these acts. Guilfoyle's crimes were undoubtedly horrific and will have life-long consequences for all involved. But we also cannot ignore the jury's decision to find him guilty but mentally ill. On the facts of this case, we conclude that a nearly maximum sentence is inappropriate and therefore revise Guilfoyle's sentence from a total of 100 years to 80 years, with the specific sentences revised as follows:

| Conviction | | Type | Original Sentence | Revised Sentence |
|---|---|---|---|---|
| Count I | Attempted Murder | Level 1 felony | 38 years | 33 years |
| | Use of a Firearm | Enhancement | 20 years | 11 years |
| Count IV | Attempted Murder | Level 1 felony | 38 years | 33 years |
| Count V | Neglect of a Dependent | Level 6 felony | 2 years | 1½ years |
| Count VI | Neglect of a Dependent | Level 6 felony | 2 years | 1½ years |
| **Total** | | | **100 years** | **80 years** |

As before, Guilfoyle's individual sentences are to be served consecutively.

[52] Our revision of Guilfoyle's sentence should not be read to lessen the severity of the nature of his crimes, nor should it be read to mean that the trial court abused its discretion in imposing Guilfoyle's sentence. However, in the exercise of our constitutional authority to review and revise sentences, we believe Guilfoyle's 100-year sentence is inappropriate.

## Conclusion

[53] In sum, the jury did not err by rejecting Guilfoyle's insanity defense, but his sentence is inappropriate under Appellate Rule 7(B). We therefore affirm Guilfoyle's convictions and remand this case to the trial court with instructions to issue an amended sentencing order consistent with this opinion.

[54] Affirmed and remanded with instructions.

Tavitas, C.J., and Vaidik, J., concur.

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Caroline G. Templeton
Assistant Section Chief, Criminal Appeals
Indianapolis, Indiana